STATE OF NEBRASKA, APPELLEE, V.
TOMMY R. BUTZKE, SR., APPELLANT.
584 N.W. 2d 449

Filed July 21, 1998.    No. A-97-436.

Gregory C. Damman for appellant.

Don Stenberg, Attorney General, and David T. Bydalek for appellee.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

MUES, Judge.

## I. INTRODUCTION

Tommy R. Butzke, Sr., was convicted of procuring alcohol for a minor, in violation of Neb. Rev. Stat. § 53-180 (Reissue 1993). He appeals, alleging the district court erred in affirming the county court's denial of his motion to suppress and in affirming the county court's finding that the evidence was sufficient to show the requisite intent necessary for conviction.

## II. STATEMENT OF CASE

Butzke had a high school graduation party for his son, Chad, on May 21, 1995. Invitations were extended to family and

friends, who were mainly married couples and their children. No teenagers were formally invited unless part of an invited family. The Butzke residence was prepared for the party to include various games and activities. Extensive food and beverage preparation was involved, with beverages to include soda pop, iced tea, punch, keg beer, and nonalcoholic beer.

On May 21, Chad, age 17, was subject to two juvenile probation orders, one of which was "intensive supervision probation" imposed due to a juvenile adjudication stemming from minor in possession (MIP) and criminal mischief charges. As a condition of probation, he was not allowed to be in places of "harmful character," including places with alcohol. He had discussed the party with his probation officer, Tom Koch, the week prior to the party. Chad told Koch that there was going to be alcohol present, just as there had been at the graduation parties his father had given for his siblings. Koch told Chad that Chad was not to drink alcohol and explained that Koch might be coming to the party to see if Chad was drinking. Butzke was aware, before the party, that Koch might be coming to check on Chad.

On the day of the party, the food, iced tea, and punch were set out in the kitchen. The keg beer was placed on the outside porch with the nonalcoholic beer and soda pop. Red plastic cups for the guests were placed beside all of the beverages. In the early afternoon, the guests began to arrive, and by the time Chad arrived in the late afternoon, people were drinking, eating, and socializing. Activities included playing basketball, volleyball, horseshoes, card games, and Nintendo and riding horses.

As Koch had warned, he eventually arrived to check on Chad. He arrived at approximately 10:45 p.m., accompanied by two Nebraska State Patrol troopers and a Seward County deputy sheriff. At trial, Koch testified that there were 50 to 75 vehicles parked near the Butzkes' rural residence as he and the officers approached it.

As Koch and the officers arrived in two vehicles, a group of people disbanded and scattered into a nearby field. As Koch and the officers exited their cars and approached the residence, they saw approximately 150 people either around the porch, in a field next to the house, or near a picnic table. As Koch proceeded toward the house, he was greeted by Chad, who was

immediately administered a breath test. The result was .000. After determining that Chad had not been drinking alcohol, Koch visited generally with Chad about the party. Koch observed a keg of beer on the front porch and about 100 people in the yard. Some held beer bottles, beer cans, or red cups and appeared to Koch to be minors, but he testified that he had no idea how old these individuals were. He then asked Chad

> if it was alright if I walked with him and basically look for alcohol. This was part of his probation he was not to be in a place of harmful character to include with alcohol, and it appeared to me that there was a high probability there was alcohol on this [sic] premises that he had access to whether he was drinking it or not. And so I obtained permission from him to see how much alcohol was on the residence.

Chad said this was fine. However, Koch also testified that he conducted the search pursuant to the probation conditions which stated that Chad was "to permit the Probation Officer to visit [him] in a reasonable manner at home, school or elsewhere" and was to "[s]ubmit to reasonable search and seizure of premises, person, or vehicle by or upon the request of the probation officer." Koch testified that he had previously discussed the probation order's conditions with Chad in the presence of Butzke and that Butzke had "signed off" on the terms of Chad's probation. However, there is no evidence that the probation conditions were discussed on the night of the search.

Koch proceeded to walk to a picnic table on the lawn south of the house. There he found Butzke and other adults seated. He testified that he told Butzke that he was going to look around and that Butzke did not object. Koch and Chad then proceeded to a field area an undescribed distance west of the house where the deputy sheriff was dumping alcohol from Busch Light beer cans. Koch then asked to take a look around the house, and Chad escorted him to the backyard area where Koch noticed 25 to 30 red cups on the ground, which, in his opinion, contained beer. He and Chad tipped over the containers. When asked where the beer was coming from, Chad told him it was on the front porch. Koch and Chad then proceeded to the garage area and then onto the front porch, with Chad leading the way. They

went inside the Butzke residence with Chad again leading the way and "proceeded to go room to room looking for any more kegs or alcohol." They did a "once through, ended up [on] the first floor, went back into a bedroom[, where they] ran into some individuals," including Jason Diederichs.

Koch described the room where he found Diederichs as a "back room or bedroom or something of that nature." The door to this room was apparently closed, as Koch testified that after the door to the room was opened, he asked the group of people inside if they were old enough to drink. According to Koch, they all replied affirmatively except Diederichs, who said, "[N]o, you know I'm not." At that point, Koch observed a red cup in Jason's hand that Koch determined contained beer. Koch testified that Chad was present during his entire conversation with Diederichs. Koch escorted Diederichs outside to the state troopers, who issued a citation for MIP after Koch told them what he had observed.

Koch then proceeded back into the house and continued his search, again with Chad leading him through the house. At some point during the search, he contacted Butzke's wife inside the house and asked her to dispose of the beer Diederichs had been drinking. Koch then went upstairs to Chad's room and found a 4-pack of wine coolers, which he took down to Butzke and advised him that Chad was not to have the wine coolers because it was a violation of his probation. Chad explained that these wine coolers belonged to his girl friend. Koch also went onto the roof of the Butzke residence and visited with Chad's brother. Shortly thereafter, the law enforcement officers, under Koch's direction, seized three kegs of beer, two of which were completely empty and the third was approximately three-fourths empty, and left the Butzke residence. Koch testified that he ordered the seizure of the readily accessible alcohol because he did not want Chad to be drinking after Koch left.

Approximately 6 months later, Butzke was charged under § 53-180 with three counts of procuring alcohol for a minor. The first count involved Diederichs. The other counts were dismissed at the end of the State's case and are not involved in this appeal.

Prior to trial, Butzke filed a motion to suppress, pertaining only to count I of the complaint. In the motion, he sought to

exclude "all observations, testimony, or physical evidence of any nature" seized as a result of the search of the residence, claiming that the search was conducted in violation of his Fourth Amendment rights. At a hearing on the motion, copies of Chad's probation orders were received into evidence, and Koch testified that both were in effect on the day of the search.

The earlier probation order was entered by the York County Court, sitting as a juvenile court. It is dated October 8, 1993, and places Chad on probation for 24 months. It states, inter alia, that Chad is to permit the probation officer to visit him in a reasonable manner at home, school, or elsewhere, and to abstain from the use of alcohol or illegal drugs. The order is signed by Chad directly under a paragraph that states that he understands the conditions and agrees to work with his parents and probation officer to satisfactorily complete probation. Portions of the order have been physically excised in the copying process, rendering illegible another signature appearing directly after a clause which says the signer has read the conditions of probation and agrees to them.

The second order is dated March 2, 1995, and bears the caption of intensive supervision probation from the York County Court, sitting as a juvenile court. It places Chad on probation for 12 months for the offenses of MIP and criminal mischief. Its terms include, inter alia, that the juvenile is to avoid places with alcohol, "[s]ubmit to reasonable search and seizure of premises, person, or vehicle by or upon the request of the probation officer," abstain from the use of alcohol, and submit to a chemical test of his blood, breath, or urine upon request of his probation officer. It is signed by Butzke and Chad under a clause which states that each acknowledges and accepts his individual responsibilities for compliance and pledges his cooperation of the same.

Butzke filed a motion to suppress, and the county court, in a written order filed June 7, 1996, made specific findings of fact regarding the motion. See *State v. Osborn*, 250 Neb. 57, 547 N.W.2d 139 (1996). These findings included that Chad consented to the probation officer's looking around the house, that Chad consented to a test for alcohol use, and that he further "gave a voluntary and intelligent consent to the search of the

premises." With regard to Diederichs, the trial court determined that the "encounter occurred in a common-use area of the home." It further found that the observation of the officer was a matter within his plain view. Finally, the court concluded that the provision in Chad's probation order requiring him to submit to various types of searches was "reasonably related to the rehabilitation" of Chad and that the officer was legally entitled to be where his observations of Diederichs took place. The motion to suppress was overruled.

A bench trial followed, at which Butzke preserved his objections to the evidence which he claimed was illegally seized. At trial, Butzke testified that he had purchased three kegs of beer for Chad's graduation party because his adult friends had told him they did not want to have to bring alcohol like they had to at the graduation parties of Butzke's other two children. He explained that the red cups were set up all over the kitchen and outside the house by the beer, the tea, the Kool-Aid, and the punch. Butzke testified that he did not even know Diederichs was at his home until Koch brought Diederichs out of the house and that Butzke did not remember speaking to Koch until Koch brought the wine coolers to him. Butzke testified that he knew that there were minors present at the party and that they had access to the beer on the front porch, but that he thought the rumor that Koch was coming out would deter the minors from drinking it. Butzke also sat in the front yard 20 yards from the porch so that he could see what was going on. He explained that the minors knew that the "beer wasn't bought for them" and that the food and nonalcoholic beverages were bought for Chad's friends.

Larry Eret, Butzke's best friend, testified that early in the evening, he heard Butzke tell one minor that she could not have beer. However, a minor testified that he had drunk eight cups of beer from the keg. Another friend of Butzke's testified that it would surprise him if a minor had secured eight cups of beer from the keg. He testified that there were lots of adults around the keg watching it, but he conceded that they were not specifically guarding against minors' drinking from it.

Diederichs testified that he had been drinking before he went to the Butzke residence but that when he found out that Koch

might be showing up, he obtained a red cup and put tea in it. He testified that he was on the front porch when Koch arrived and that he went into the house to stay out of Koch's way. He further testified that he had tea in the glass when Koch came into the bedroom and that however, when Koch asked him if he had been drinking, he replied in the affirmative because of the two beers he had had before arriving at the Butzke residence. The arresting officer testified that there was a strong odor of alcohol on Diederichs' breath and that in his opinion, Diederichs would have had to have drunk alcohol during the hour he was at the Butzke residence for the odor to be that strong. The arresting officer also testified that when Koch told him Diederichs had alcohol in his glass, Diederichs did not deny it until after the citation was written. At that point, he began claiming it was iced tea in his glass. Koch testified that there was no doubt that there was beer in Diederichs' red cup.

Butzke was found guilty of procuring alcohol for Diederichs. On appeal to the district court, Butzke challenged the sufficiency of the evidence and the lower court's denial of his motion to suppress. His conviction was affirmed. He timely filed his appeal to this court.

### III. ASSIGNMENTS OF ERROR

Restated, Butzke's assigned errors are that the district court erred in affirming the county court's denial of his motion to suppress and in affirming the county court's finding that the State proved beyond a reasonable doubt that he had procured alcohol for a minor in violation of § 53-180.

### IV. STANDARD OF REVIEW

A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Chitty*, 253 Neb. 753, 571 N.W.2d 794 (1998); *State v. Ready*, 252 Neb. 816, 565 N.W.2d 728 (1997).

■ In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Parks*, 253 Neb. 939, 573 N.W.2d 453 (1998).

## V. DISCUSSION

### 1. MOTION TO SUPPRESS

As stated, the trial court found that Chad had given a voluntary and intelligent consent to the search of the premises. It also noted that "evidence found during a search consented to by one family member is admissible to prove charges against another family member who resides at that location." It also observed that the probation conditions requiring submission to search were reasonably related to the rehabilitation of Chad, thus entitling Koch to be in the place where he made his observation of Diederichs.

Butzke challenges the legality of the warrantless search of his residence which led to Koch's observation of Diederichs with the beer in the red plastic cup. The State responds by arguing that this was a reasonable search pursuant to the terms of Chad's juvenile probation and, alternatively, that Chad, as a resident of the household, had a sufficient relationship to the premises to consent to the search and did, in fact, so consent.

■ Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions which must be zealously and carefully drawn and applied only where there is a showing that the exigencies of the situation made that course imperative. *State v. Craven*, 253 Neb. 601, 571 N.W.2d 612 (1997). In the case of a search and seizure conducted without a warrant, the State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement. *Id.* Stated another way, "If police have acted without a search warrant, the State has the burden to prove that the search was conducted under circumstances substantiating the reasonableness

of such search or seizure." *State v. Vermuele*, 241 Neb. 923, 925, 492 N.W.2d 24, 27 (1992).

### (a) Probation Search

Butzke concedes the reasonableness of Koch's coming to his residence, talking with Chad, and giving Chad a breath test to determine whether Chad was in a place with or was in the possession of alcohol. In fact, Butzke even concedes the reasonableness of the probation officer's entering the house and searching Chad's room.

As the State argues, it appears to be well settled in Nebraska that "conditions in probation orders requiring the probationer to submit to warrantless searches, to the extent that they contribute to the rehabilitation process and are done in a reasonable manner, are valid and constitutional." *State v. Morgan*, 206 Neb. 818, 826-27, 295 N.W.2d 285, 289 (1980). See, also, *State v. Finnegan*, 232 Neb. 75, 439 N.W.2d 496 (1989); *State v. Lingle*, 209 Neb. 492, 308 N.W.2d 531 (1981). In *Morgan, supra*, the Supreme Court concluded that a search of a probationer's residence and person did not violate the Fourth Amendment, although it was without probable cause, because he had "consented" to the search in advance by agreeing to certain terms of probation, including the requirement that he submit to such searches with or without probable cause. We find no reported Nebraska cases applying the above rule to juvenile probation orders. The universal application of the "advanced consent" rationale of *Morgan* has been rejected by at least one court in a juvenile context. In *In re Tyrell J.*, 8 Cal. 4th 68, 876 P.2d 519, 32 Cal. Rptr. 2d 33 (1994), the court concluded that a juvenile has no choice under California law in the conditions of probation imposed and that consequently, accepting probation is not deemed consent to search. However, the search in *In re Tyrell J.* was valid, because even a juvenile probationer had no reasonable expectation of privacy in the object of the challenged search, in that case, illegal contraband hidden in the juvenile's pants. In *Griffin v. Wisconsin*, 483 U.S. 868, 871, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987), the Court held that the warrantless search of the petitioner's residence was reasonable when conducted pursuant to a state regulation permitting a probation

officer to search a probationer's home without a warrant, as long as the probation officer's supervisor approved and as long as there were " 'reasonable grounds' " to believe the presence of contraband existed. In any event, it is not necessary for us to decide whether the present search was a valid probation search, because the trial court made an alternate finding in upholding the legality of this search, which basis we affirm below. It specifically determined that the search was a valid third-party consent search. Because we conclude that the factual findings for that determination were not clearly erroneous, there is no need for us to determine the validity of the search on other grounds.

### (b) Consent Search

■ The right to be free from an unreasonable search and seizure, as guaranteed by the 4th and 14th Amendments to the U.S. Constitution and by article I, § 7, of the Nebraska Constitution, may be waived by the consent of the citizen. *State v. Ready*, 252 Neb. 816, 565 N.W.2d 728 (1997), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). In order for a consent to search to be effective, however, it must be a free and unconstrained choice and not the product of a will overborne. *State v. Chitty*, 253 Neb. 753, 571 N.W.2d 794 (1998); *Ready, supra.*

■ When the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that the consent was given by the defendant, but may show that the permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996), citing *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). See, also, *State v. Walker*, 236 Neb. 155, 459 N.W.2d 527 (1990); *State v. Van Ackeren*, 200 Neb. 812, 265 N.W.2d 675 (1978); *State v. Ramold*, 2 Neb. App. 545, 511 N.W.2d 789 (1994).

■ A warrantless search is valid when based upon consent of a third party whom the police, at the time of the search, reasonably believed possessed authority to consent to a search of the

premises, even if it is later demonstrated that the individual did not possess such authority. *Konfrst, supra*, citing *Illinois v. Rodriguez*, 497 U.S. 177, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). See, also, *State v. Caniglia*, 1 Neb. App. 730, 510 N.W.2d 372 (1993).

As we understand Butzke's argument, it is that Chad did not voluntarily consent to a search of the premises and that even if he did, the consent was not valid as a third-party consent because Chad had no authority to allow the broad, sweeping, room-to-room search which eventually disclosed Diederichs. The burden is upon the government to prove that a consent to search was voluntarily given. *State v. Prahin*, 235 Neb. 409, 455 N.W.2d 554 (1990). When the consent of a third party is relied upon, "[t]he burden of establishing . . . common authority [over the premises] rests upon the State." *Rodriguez*, 497 U.S. at 181.

The issue, then, is whether or not the consent of Chad, a minor, was voluntary and, if so, whether it was a valid third-party consent as against Butzke. We find no reported Nebraska case addressing the validity of a third-party consent by a minor child. It is a topic, however, addressed by several other jurisdictions as well as legal writers. See, e.g., Annot., 99 A.L.R.3d 598 (1980); 3 Wayne R. LaFave, Search and Seizure, a Treatise on the Fourth Amendment, § 8.4 (3d ed. 1996). See, also, Matt McCaughey, *And a Child Shall Lead Them: The Validity of Children's Consent to Warrantless Searches of the Family Home*, 34 U. Louisville J. of Family Law 747 (1995-96).

Logic suggests that when the State relies upon a minor's third-party consent to justify a warrantless search, the child's age, intelligence, and maturity are critical on the voluntariness issue, on the question of whether the child possessed common authority over or other sufficient relationship to the area or thing sought to be inspected, and on whether the searching party reasonably believed the child possessed authority to consent even if it is later demonstrated that the child did not possess such authority. See, *Rodriguez, supra*; *Matlock, supra*; *Schneckloth, supra*.

The decisions of other jurisdictions disclose that these as well as many other factors are typically looked at when considering the validity of a minor's consent to search. See, e.g.,

*Saavedra v. State*, 622 So. 2d 952 (Fla. 1993); *Davis v. State*, 262 Ga. 578, 422 S.E.2d 546 (1992); *State v. Kriegh*, 23 Kan. App. 2d 935, 937 P.2d 453 (1997); *State v. Will*, 131 Or. App. 498, 885 P.2d 715 (1994). Without attempting to summarize such factors, we believe a minor child's third-party consent to search is ultimately subject to the same analysis as any other third-party consent case—Was the consent voluntary under *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), and *State v. Ready*, 252 Neb. 816, 565 N.W.2d 728 (1997), and, if so, did the third party possess common authority over or other sufficient relationship to the premises under *Matlock, supra*, and *Konfrst, supra*, or, if not, did the person doing the search, at the time of the entry, reasonably believe the person giving the consent possessed such common authority over the premises under *Rodriguez, supra*, and *Konfrst, supra*?

### *(i) Was It Voluntary?*

The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and voluntariness is a question of fact to be determined from all the circumstances. *State v. Chitty*, 253 Neb. 753, 571 N.W.2d 794 (1998). The trial court found that Chad had voluntarily consented to the search of the premises. Because voluntariness is a question of fact, our review is limited to whether the trial court's finding was clearly erroneous. See, *Chitty, supra*; *State v. Ready*, 252 Neb. 816, 565 N.W.2d 728 (1997). In making this determination, we do not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognize the trial court as the finder of fact and take into consideration that it observed the witnesses. *Chitty, supra*; *Ready, supra*. To be effective, a consent to search must be a free and unconstrained choice and not the product of a will overborne. *Chitty, supra*; *Ready, supra*. The consent must be given voluntarily and not as a result of duress or coercion, whether express, implied, physical, or psychological. *Chitty, supra*; *Ready, supra*.

We cannot say that the trial court's finding that Chad voluntarily consented to the search was clearly erroneous. At the time, Chad was 17 years old. At Koch's request, Chad voluntar-

ily took Koch on a tour of the surrounding area and the house and eventually into the bedroom where Diederichs was found. There is no evidence of trickery, deceit, force, or misunderstanding. Obviously, Koch was an authority figure then controlling significant aspects of Chad's life. However, the record discloses no overt coercion of Chad by Koch. There is no evidence that the probation condition was directly used as a tool to force the search or even discussed on the evening of the search. While we may find it difficult to accept that a teenager's acquiescence in his probation officer's request did not involve at least some degree of psychological pressure, given the teachings of *Chitty* and *Ready*, we are not prepared to say that the trial judge was clearly wrong in finding as a matter of fact that the consent was voluntary.

### (ii) Common Authority Over Area Searched

Common authority is . . . not to be implied from the mere property interest a third party has in the property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock*, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974).

As part of the trial court's findings, it determined that Diederichs was found "in a common-use area of the home." We view this finding, at least in part, to be the trial judge's attempt to address the *Matlock* requirement of common authority and "mutual use." As stated above, it is the State's burden to prove such common authority. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). We believe this, like the issue of voluntariness, involves a factual determination, again subject to the clearly erroneous standard of review. See, e.g., *Chitty, supra*; *Ready, supra*.

What evidence did the State offer to show that Chad had authority over the residence common to that of Butzke? We

recall that "joint access or control for most purposes" is a key ingredient in this determination.

Aside from evidence that Chad was a resident in the Butzke residence, the record is absent as to any particular evidence from which we can determine or understand the nature and extent of Chad's control over the Butzke residence in general and, in particular, the bedroom being searched where Diederichs was observed. No evidence was offered regarding Chad's general control over the house; his having keys to the residence; whose bedroom this was (except that it was not Chad's); Chad's authority, generally, to invite guests into some or all parts of the house; et cetera. Indeed, all we are told about this room is that it was a "back bedroom" or a bedroom of some kind located on the first floor and that Chad opened the door for Koch to go into it. In it were several people, including Diederichs. Unless we were to conclude that Chad's leading Koch to this bedroom was evidence of Chad's "authority" over it, a reach we believe would render the "common authority" analysis meaningless, there is really no evidence to support a factual finding that Chad had common authority over or a sufficient relationship to this bedroom to justify his valid consent to its search. As stated in 3 Wayne R. LaFave, Search and Seizure, a Treatise on the Fourth Amendment, § 8.4(c) at 773 (3d ed. 1996), in minority consent cases, the scope of the consent is important

> because there are degrees of privacy in various parts of a family home, so that even a person with a lesser interest than the parents might admit persons to some areas but not others. Thus, even a child in his teens could not give a valid consent to the police to conduct a thorough search of the premises.

With full appreciation of our limited standard of review on the factual issue of common authority in this case, we are constrained to conclude that to the extent that the trial judge's statement that the room was a "common-use area" was intended as a finding that Chad had common authority over it in the *Matlock* sense, the trial judge's statement was clearly erroneous. This is true especially in light of the fact that both Butzke and his wife were present at this party and that Koch

knew it and yet made no efforts to request consent to search from either of them. It seems to us that the parents' presence at the time a minor's consent is given enhances the State's burden to prove the minor's common authority over the area searched. See *State v. Kriegh*, 23 Kan. App. 2d 935, 937 P.2d 453 (1997) (noting that availability or presence of parent in home is relevant factor in determining validity of minor's consent and its scope).

### (c) Reasonable Belief in Authority

We will now move to whether the warrantless search can be justified on the basis that Koch reasonably believed Chad possessed authority to consent to the search, even though we have concluded that the State failed to demonstrate that he in fact possessed such authority. See *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996). "[W]hat is at issue when a claim of apparent consent is raised is not whether the right to be free of searches has been *waived*, but whether the right to be free of *unreasonable* searches has been *violated*." (Emphasis in original.) *Rodriguez*, 497 U.S. at 187. *Rodriguez* made it clear that "reasonable belief" is an objective test, not a subjective one, and the Nebraska Supreme Court has applied it as such. See *Konfrst, supra.*

As stated, the trial judge found that the area in which Diederichs was observed was a "common-use" area. Such a finding carries several meanings. One, as discussed above, is that it was an area which Chad had common authority over for *Matlock* purposes. Another is that the area was one which was in apparent common use on the evening in question and that accordingly, Koch was justified in believing that Chad had the authority to consent to its search. As stated, Chad took Koch to this area of the house, opened the door, and exposed the occupants to him. The room was obviously in use that evening by several people, as was the rest of the house in general. Moreover, Koch had just advised Butzke of his intent to look around with Chad and received no objection. Finally, we recall that Butzke himself had pledged cooperation, in writing, to allow reasonable searches of Chad's premises, a matter which Koch was fully aware of.

It seems entirely plausible to us, in view of the unique circumstances of this case, that Koch could be found to have reasonably believed that Chad had the authority to consent to the search of the room in question whether or not he in fact enjoyed such authority. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). Construing the trial court's finding to mean that Koch reasonably believed that Chad had the authority to consent to the search of the room where Diederichs was found, we find the trial court's finding was not clearly erroneous. Therefore, Butzke's first assignment of error is without merit.

## 2. SUFFICIENCY OF EVIDENCE

Section 53-180 provides that "[n]o person shall sell, give away, dispose of, exchange, or deliver, or permit the sale, gift, or procuring of any alcoholic liquors, to or for any minor . . . ." Butzke argues that the evidence was deficient to convict him of violating this law.

Butzke first argues that the evidence is insufficient to show that minors were drinking beer he had purchased or, if so, to show that he knew they were. He argues that at best, the evidence shows that he "permitted" the possession or consumption of alcohol by a minor, and he cites *State v. Jansen*, 241 Neb. 196, 486 N.W.2d 913 (1992), to support the contention that such is not prohibited by § 53-180.

It is true that *Jansen* holds that § 53-180 does not criminalize allowing or permitting the possession of alcohol by minors. Butzke's permitting minors to possess alcohol other than that furnished by Butzke was not prohibited by § 53-180. However, in *Jansen*, the defendant testified that he did not furnish the beer for the "keg party" which was taking place on his property and which he had knowledge of, whereas here, Butzke stipulated that the kegs of beer at the party had been purchased by him for the party. Moreover, the evidence here shows far more than Butzke's merely permitting minors to drink alcohol on his premises.

Butzke argues that his warning to one of the minors that the beer was not for the minors indicates that he did not intend for the beer to be consumed by minors and therefore that he did not

violate § 53-180. We do not disagree that such a warning tends to indicate such an intent. On the other hand, the fact finder was not compelled to accept that testimony or to draw such inference from it. The evidence is that Butzke was sitting at a picnic table at a location not far from the kegs which were on the porch and that at least one minor had consumed a fairly large quantity of beer from the kegs that evening with no protest from Butzke or anyone else. The kegs were in full view and fully accessible to anyone who wanted to approach them and fill up one of the red plastic cups furnished for that purpose.

Butzke argues that he did not even know Diederichs was at the party, but he provides no authority for the proposition that to convict him, the State had to prove that he knew a particular minor was consuming alcohol furnished by him. In *State v. Smith*, 221 Neb. 406, 407, 377 N.W.2d 527, 528 (1985), liquor control agents, working undercover, observed the defendant with a group of "young-looking patrons." One of the agents observed the defendant purchase beer and a mixed drink, return to the table, and place the drinks on the table. The agents then observed each of the four individuals consume some of the alcohol. On appeal, the defendant claimed, inter alia, that the evidence was insufficient to support his conviction because there was no evidence that he "intended to procure liquor for a minor." *Id.* at 408, 377 N.W.2d at 529. The Supreme Court summarily rejected this argument. The intent with which an act is done is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *Id.* Concluding that the requisite intent is a question of fact which was resolved against the defendant by the trial court, the court affirmed the conviction.

In procuring liquor for a minor, the general criminal intent is supplied by the performance of the proscribed act. The offense of procuring liquor for a minor does not involve a specific criminal intent. *State v. Lesiak*, 234 Neb. 163, 449 N.W.2d 550 (1989). See *State v. Koperski*, 254 Neb. 624, 578 N.W.2d 837 (1998) (as general intent crime, criminal intent is inferred from commission of acts constituting elements of crime). Viewing the circumstantial evidence most favorably to the State, as we must, *State v. Parks*, 253 Neb. 939, 573 N.W.2d 453

(1998), it establishes that Butzke gave away or delivered alcoholic liquor to Diederichs, a minor.

This assignment of error is without merit.

## VI. CONCLUSION

We render no opinion on the propriety of the juvenile probation condition requiring submission to a search of premises or on whether the search conducted here was a "reasonable" one under that probation condition. Instead, we conclude that the search of the premises fell within the third-party consent exception to the general rule against warrantless searches—specifically, that the trial court was not clearly wrong in its factual finding that Chad's consent was voluntary and in its implicit factual finding that Koch reasonably believed Chad to have authority over the area wherein Diederichs was located and observed.

We further conclude that viewing the evidence most favorably to the State, it is sufficient to support Butzke's conviction for violating § 53-180.

AFFIRMED.