Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/31/2024 09:09 AM CST

STATE OF NEBRASKA, APPELLEE, V.
WILLIAM B. LANGLEY, APPELLANT.
___ N.W.3d ___

Filed December 26, 2024.    No. A-23-1039.

1. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearings on the motion to suppress.

2. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. And where the facts are largely undisputed, the ultimate question is an issue of law.

3. **Constitutional Law: Search and Seizure: Warrantless Searches.** Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions.

4. **Constitutional Law: Search and Seizure: Duress.** Generally, to be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice, and not the product of a will overborne.

5. **Constitutional Law: Search and Seizure.** The determination of whether the facts and circumstances constitute a voluntary consent to a search, satisfying the Fourth Amendment, is a question of law.

6. **Search and Seizure.** Whether consent to a search was voluntary is to be determined from the totality of the circumstances surrounding the giving of consent.

7. ____. Consent to a search may be implied by action rather than words.

8. **Warrantless Searches: Minors.** When the State relies upon a minor's third-party consent to justify a warrantless search, the child's age, intelligence, and maturity are critical on the voluntariness issue, on the question of whether the child possessed common authority over or other sufficient relationship to the area or thing sought to be inspected, and on whether the searching party reasonably believed the child possessed authority to consent even if it is later demonstrated that the child did not possess such authority.

9. **Evidence: Appeal and Error.** The erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

Appeal from the District Court for Scotts Bluff County: Leo P. Dobrovolny, Judge. Affirmed.

Jessica R. Meyers, Chief Deputy Scotts Bluff County Public Defender, for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent for appellee.

Riedmann, Chief Judge, and Moore and Welch, Judges.

Moore, Judge.

## INTRODUCTION

William B. Langley appeals from his conviction in the district court for Scotts Bluff County for possession of a firearm by a prohibited person. His sole assignment of error is that the court erred in denying his motion to suppress evidence located in a search of his residence. For the reasons contained herein, we affirm.

## STATEMENT OF FACTS

On February 6, 2023, Langley was charged by information with two counts of possession of a firearm by a prohibited person, both Class ID felonies. The counts concerned a handgun and a rifle, respectively. Because Langley was ultimately acquitted of the count concerning the rifle, we will not recite facts related to that count.

On September 27, 2023, Langley filed a motion to suppress "all fruits of the illegal search" of his home by Robert Hackett, a sergeant with the Scotts Bluff County sheriff's office and the chief of police for Lyman, Nebraska. Langley alleged that the search was unconstitutional, because Hackett returned to Langley's home without a warrant and after Langley had been arrested; thus, Langley was not home to consent to a search.

A hearing on the motion to suppress was held on October 3, 2023. The following evidence was adduced.

Leif Swan, a probation officer, testified that he began supervising Langley in January 2021 with respect to three criminal cases that were transferred to Nebraska from Colorado through the "Interstate Compact Defender Tracking System."

Langley's three probation orders detailing the conditions of his probation were entered into evidence. Pursuant to Langley's probation orders, he was prohibited from consuming alcohol and possessing or having access to firearms. He was also required to submit to searches of his residence by "the probation officer when there are reasonable grounds to search." Swan was a "high risk officer," meaning that his minimum required contacts with a probationer include at least one home visit, one phone call, and one office meeting a month.

On the morning of January 17, 2023, Swan called Langley to schedule a meeting to discuss enrolling Langley in various classes. A few minutes into the phone call, Swan noticed that Langley was slurring his words and began to suspect that Langley was under the influence of alcohol. Based upon Swan's suspicion that Langley was intoxicated, he and another probation officer went to Langley's residence to administer a preliminary breath test to Langley. Langley submitted to the preliminary breath test, which yielded a result of ".279."

Inside Langley's residence, Swan saw an alcohol container sitting on the kitchen counter. Swan then initiated a search "just to get rid of any alcohol [that] might still be there." Swan informed Langley that he would be searching his residence but did not ask Langley for permission given that Langley had a "search and seizure clause" in his probation orders.

Inside a dresser drawer in Langley's bedroom, Swan found an empty manufacturer box for a "Taurus 9mm" handgun, along with some empty alcohol containers. When Swan asked Langley where the gun was located, Langley provided "multiple different stories," including that the empty box was garbage and had come with the dresser and that various individuals were in possession of the gun.

Swan was concerned that he had found the handgun box but not the handgun itself, as Swan thought that Langley's son, born in October 2005, may have access to the handgun. Swan text messaged a photograph of the handgun box to Hackett, who asked if Langley was a felon. Swan replied in the affirmative. Hackett then responded that he had dispatched officers to Langley's home.

Video footage from a body camera worn by a dispatched officer was entered into evidence. The body camera footage shows officers searching Langley's and his son's bedrooms; however, a handgun was not recovered. The footage indicates that no one except Langley and law enforcement officers were inside the residence at the time. Langley was arrested and taken to jail, and the empty residence was locked.

Hackett testified that when he received Swan's phone call, he was working for the sheriff's office. Later that evening, he went to Langley's residence in his professional role with the Lyman Police Department. Hackett testified that when he went to the residence, he was aware that Langley had already been arrested. Hackett did not visit Langley at the jail to obtain his consent to search his home.

When Hackett went to Langley's residence, there were no other law enforcement officers present. Langley's son, as well as Langley's girlfriend and her mother, were inside the home. Hackett was aware that neither woman lived at the residence and that the son was a minor at the time. Swan later testified that he had contacted the son, who arranged to stay with Langley's girlfriend and her mother. The three were inside the residence that evening to collect the son's items.

Footage from Hackett's body camera on the evening of January 17, 2023, was entered into evidence. Hackett's body camera footage was played during the hearing, and Hackett provided testimony consistent with the video. Hackett testified that when he approached Langley's residence, he knocked on the door and someone from inside the residence told him he could come in. Hackett testified that a jailhouse phone call between Langley and his girlfriend confirmed that the girlfriend had told Hackett he could enter the residence.

The body camera footage shows that as Hackett stepped inside, Langley's son emerged from the back of the residence and greeted him. On the video, Hackett can be heard saying, "Leif called you. We're worried about a gun." The girlfriend's mother then led Hackett into the living room, where she handed Hackett a locked silver case and stated that the son had last seen the handgun inside of the case. The son stated to Hackett, "I'm fairly confident the gun's in there." The girlfriend's mother also told Hackett that she and the son had looked inside of Langley's truck and a few other locations where Langley had previously hidden items, but they were unable to find the handgun.

The body camera footage then shows that the girlfriend's mother received a call from Swan, and she handed her phone over to Hackett. On the phone, Hackett told Swan that he decided to "stop by" the residence because he could see that people were inside. Hackett informed Swan that a locked gun case had been found inside the residence. Hackett told Swan that he assumed probation rules would allow Swan to open the locked case but that "probation rules are different than . . . my rules." Swan informed Hackett that "I'm allowed to give you permission." Swan then authorized Hackett to seize the case.

The body camera footage shows that the son and girlfriend continued to search the residence for the gun. Hackett testified that he did not open any drawers or cabinets in Langley's home. The body camera footage is consistent with Hackett's

testimony and shows him looking in areas of the residence after they have been opened by the son. The son also offered Hackett his house key so that Hackett could later return to the residence on his own. Hackett declined the house key from the son, explaining that probation may come back for an additional search, but that Hackett was only inside the residence because he had been invited in. Hackett testified that no one in the residence asked him to leave or indicated that they did not wish to speak to him.

Hackett testified that the following day, he and Swan spoke with Langley at the jail about the locked silver case. Langley stated that the firearm and ammunition were likely in the case and that he did not know the combination to the case as it belonged to a friend. Hackett then obtained a search warrant to open the locked silver case. Because Langley did not know the combination, the case was forced open at the sheriff's office. Inside the case, Hackett found two magazines, shotgun shells, and a "Taurus 9 mm" that matched the serial number of the manufacturer box discovered by Swan.

In an order filed on October 16, 2023, the district court denied Langley's motion to suppress. The court first found that the activity which led to concern about a handgun was permitted as authorized by the search clause in a probation order, which was binding on Langley. The court found that after Langley was arrested, Hackett was later checking on the home and stopped after seeing someone was there. The court found that Hackett was granted entry into the home by someone with apparent authority to admit him and that there was no objection by the son or anyone else to his presence. The court concluded that Hackett did not infringe upon a legitimate expectation of privacy or intrude on a protected area.

Additionally, the district court determined that no search was conducted by Hackett; rather, he made a general inquiry about the handgun, at which time the locked gun case was "simply presented to Officer Hackett after his inquiry - he did nothing other than come in the door after being invited

to do so, and ask about a handgun." The court noted that someone at the residence apparently searched for and found the locked case, which was not found during the earlier probation search. The court concluded that Hackett's entry into the home was not a search and that if there was a search, it was done by someone other than law enforcement, so the Fourth Amendment was not implicated. Thereafter, the case was opened and the gun discovered pursuant to a "properly issued warrant signed by a Nebraska judge."

At a jury trial held on October 24, 2023, Swan and Hackett testified regarding their efforts to recover the handgun. When the State later offered the handgun into evidence, Langley objected based on his motion to suppress, and the district court overruled the objection.

The State also offered Hackett's body camera footage from Hackett's conversation with Swan and Langley on January 18, 2023. On the body camera footage, Hackett asked Langley whether his DNA would be on the handgun, to which Langley answered, "Probably." Langley also told Hackett that he had acquired the gun for protection after a police officer had been attacked in Langley's neighborhood. Langley did not object to Swan's and Hackett's testimony about the handgun, nor did he object to his custodial statement to Hackett.

The case was submitted to the jury, which found Langley guilty of one count of possession of a firearm by a prohibited person, concerning the handgun. Langley was found not guilty of the count concerning the rifle. The district court accepted the jury's verdict and convicted Langley of the offense. The court later sentenced Langley to a term of 3 to 3 years' imprisonment.

Langley appeals.

## ASSIGNMENT OF ERROR

Langley assigns that the district court erred in concluding that no search occurred and thereby denying Langley's motion to suppress.

## STANDARD OF REVIEW

[1] When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearings on the motion to suppress. *State v. Hammond*, 315 Neb. 362, 996 N.W.2d 270 (2023).

[2] In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. And where the facts are largely undisputed, the ultimate question is an issue of law. *Id.*

## ANALYSIS

Langley argues that Hackett violated his Fourth Amendment rights by entering his home without authorized consent. Specifically, Langley asserts that the girlfriend did not have authority to invite Hackett into Langley's residence and that because Hackett did not obtain permission from the son, his entry into the residence was an unlawful search and any evidence seized as a result of that search should be suppressed.

[3-7] Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions, which include searches undertaken with consent. See *State v. Hammond, supra*. Generally, to be effective under the Fourth Amendment, consent to search must be a free and unconstrained choice, and not the product of a will overborne. *Id.* The determination of whether the facts and circumstances constitute a voluntary consent to search, satisfying the Fourth Amendment, is a question of law. *Id.* Whether consent to a

search was voluntary is to be determined from the totality of the circumstances surrounding the giving of consent. *Id*. Consent to a search may be implied by action rather than words. *Id*.

In this case, the district court did not make any specific findings regarding whether consent to search was obtained, or whether any other exception to the prohibition against warrantless searches applied. Rather, the court found that there was not a search. In its order denying the motion to suppress, the court first noted that the initial probation search was lawful and was not challenged. The court then found that Hackett was later checking the home, which was last known to be empty, and observed that someone was there, so he stopped and approached the residence. The court found that Hackett requested and was granted entry by someone with apparent authority to admit him. The court found that the son entered the room at the same time as Hackett and did not object to Hackett's presence. The court found that no search was conducted by Hackett; rather, he simply made a general inquiry about the handgun, at which time the girlfriend handed him the locked case that someone other than law enforcement had discovered and brought forth. The minor son reported to Hackett that the last time he saw the gun, it was placed in the case. Thereafter, the case was opened, and the gun was discovered pursuant to a properly issued warrant.

This case presents two questions: whether Hackett had permission to enter Langley's residence and whether Hackett thereafter performed a search. See, *State v. Bond*, 23 Neb. App. 916, 877 N.W.2d 254 (2016), *disapproved on other grounds, State v. Hammond*, 315 Neb. 362, 996 N.W.2d 270 (2023); *State v. Turner*, 23 Neb. App. 897, 880 N.W.2d 403 (2016) (analyzing consent to enter residence and consent to search separately), *disapproved on other grounds, State v. Hammond, supra*. The State asserts that consent was given to Hackett to enter the residence, which led to the discovery of the silver gun case that was eventually found to contain a handgun. We

will first focus on the question of whether consent to enter the residence was given to Hackett. Generally, absent exigent circumstances, a law enforcement officer must have a warrant or consent to enter a person's home. See *State v. Resler*, 209 Neb. 249, 306 N.W.2d 918 (1981). Consent must be a free and unconstrained choice, and not the product of a will overborne. See *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001), *disapproved on other grounds, State v. Hammond, supra*.

[8] Langley was not present when Hackett returned to Langley's residence the second time and therefore could not have given consent for Hackett to enter the residence. The State asserts that Langley's son was present and gave consent. In the context of consent to search, when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant but may show that the permission to search was obtained from a third party who possessed common authority over or other sufficient relationship over the premises or effects sought to be inspected. See *State v. Andera*, 307 Neb. 686, 950 N.W.2d 102 (2020). When the State relies upon a minor's third-party consent to justify a warrantless search, the child's age, intelligence, and maturity are critical on the voluntariness issue, on the question of whether the child possessed common authority over or other sufficient relationship to the area or thing sought to be inspected, and on whether the searching party reasonably believed the child possessed authority to consent even if it is later demonstrated that the child did not possess such authority. *State v. Butzke*, 7 Neb. App. 360, 584 N.W.2d 449 (1998), *disapproved on other grounds, State v. Hammond, supra*.

As noted by the State, Langley's son was present in the residence when Hackett returned. Though Langley's girlfriend was the individual who invited Hackett to come inside after he knocked on the residence, Hackett's body camera footage demonstrates that as Hackett stepped inside, the son emerged from the back of the residence and greeted him. The son did not object to Hackett's presence or ask him to leave.

Langley does not argue that the son, who was 17 years old on the day in question, was not sufficiently mature to grant consent. Hackett can be heard on his body camera footage asking the son about his plans to join the military after graduating from high school. The son was able to answer Hackett's questions intelligently and completely. Thus, the record confirms that the son was of an age and maturity to voluntarily grant consent for Hackett to enter the residence. A review of Hackett's body camera footage also establishes that the son possessed common authority over the premises. The girlfriend's mother stated that the group was back at the residence so that the son could pack his items to stay with the girlfriend and her mother during Langley's incarceration, which the son affirmed.

Based upon the foregoing facts, we agree with the district court that Hackett entered the residence with consent. We further agree with the district court that after entering the residence, the resulting recovery of the gun case was not the result of a search by Hackett. The record shows that the son was aware that law enforcement wanted to recover the gun and that the son, along with Langley's girlfriend and her mother, had continued to search for the gun after Swan and other law enforcement officers earlier left the residence. Shortly after Hackett entered the residence, he was handed the locked gun case by the girlfriend's mother as the son informed Hackett that he was confident the handgun was inside the case.

Although the son continued to search for the gun and led Hackett into various rooms of the residence, the gun was not recovered at that time. A warrant was later obtained to gain entry into the locked gun case, which entry resulted in discovery of the gun that matched the description of the manufacturer box initially found in Langley's dresser.

The evidence from both the suppression hearing and trial demonstrates that Hackett entered the residence with the son's consent and that the recovery of the locked gun case was not

the result of a search by Hackett. Therefore, we conclude that the district court properly denied Langley's motion to suppress.

[9] Additionally, even if the district court erred by denying Langley's motion to suppress, such an error would be harmless. The erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Rush*, 317 Neb. 622, 11 N.W.3d 394 (2024).

Though at trial Langley objected to the State's offer of the handgun into evidence, he offered no objection to Swan's or Hackett's testimony regarding their respective effort to recover the handgun. Nor did Langley object to the State's offer of Hackett's body camera footage, which included his custodial statement to Hackett. Here, the testimony of Swan and Hackett, as well as Langley's admission that he owned the handgun, independently supported his conviction. Therefore, the admission of the handgun was cumulative.

## CONCLUSION

Having found that law enforcement entered Langley's residence with consent and did not perform a search, we find no error in the district court's denial of Langley's motion to suppress. Further, even if an unlawful entry or search occurred, the admission of the handgun into trial evidence was cumulative, and thus harmless error. We therefore affirm Langley's conviction and sentence.

AFFIRMED.