STATE OF NEBRASKA, APPELLEE, V.
WILLIAM M. RESLER, JR., APPELLANT.

306 N.W.2d 918

Filed June 19, 1981. No. 43831.

Whelan, Foote & Scherr, P.C., for appellant.

Paul L. Douglas, Attorney General, and Marilyn B. Hutchinson for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, MCCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

KRIVOSHA, C.J.

The appellant, William M. Resler, Jr. (Resler), appeals from a conviction based upon a jury verdict finding Resler guilty of four counts of burglary and two counts of first degree sexual assault. The trial court sentenced Resler to the Nebraska Penal and Correctional Complex for a term of not less than 6 years nor

more than 10 years on each conviction of burglary, and for a term of not less than 10 years nor more than 15 years for each conviction of first degree sexual assault, each sentence to be served concurrently.

Resler appeals to this court, principally maintaining that the trial court erred in not suppressing certain evidence which Resler maintains was obtained in violation of his rights under the fourth amendment to the Constitution of the United States. It appears to us that the specific issue raised by Resler involving the fourth amendment has not heretofore been decided by this court. On a close reading of the record and an examination of the numerous decisions rendered by other jurisdictions which have addressed this specific fourth amendment issue, we find that the action of the trial court in refusing to suppress the evidence was, in all respects, correct. Furthermore, we find that the other assignments of error raised by Resler must likewise be rejected. The judgment must be affirmed.

The record discloses that beginning in late 1978 and continuing during 1979, Hastings, Nebraska, was afflicted by a series of unsolved burglaries as well as several sexual assaults. All of the burglaries, as well as the sexual assaults, were committed in residences occupied by females and in each instance undergarments belonging to the female occupants were taken. With the exception of a man who was charged and later released in connection with one of the sexual assaults, no one was arrested for any of these crimes until Resler was taken into custody shortly after December 11, 1979. Although the record is unclear as to the basis for the belief, it does appear that during all this time a Sergeant Murphy of the Hastings Police Department suspected that Resler was involved in all these crimes. He had asked that he be called in on any incident involving Resler, regardless of the time of day or night.

Late on the evening of December 10, 1979, the occupants of an apartment unit at 745 South Baltimore Avenue heard noises in the lower level of their apart-

ment and called the police. The apartment was a part of a complex consisting of a series of 16 free-standing rowhouse-type units. Resler lived in one of the units.

Later, in the early morning hours of December 11, and apparently before the police arrived, another tenant, Thomas Waddle, saw a prowler outside his window. Waddle watched the prowler as he went from apartment to apartment in the complex, checking doors. Waddle secured his .22-caliber rifle, went out of doors, and followed the prowler. Waddle observed the prowler enter an apartment, and when the prowler came out of the apartment Waddle ordered him to stop or be shot. The prowler started running and Waddle shot at the prowler. The prowler fell to his knees, though at the time it was uncertain as to whether he fell because he had been shot or because he was attempting to get out of range of the rifle. In any event, in a moment the prowler regained his footing and proceeded running once again. At about the time that Waddle fired his shot, a Hastings police officer arrived at the scene. When the officer heard the shot he joined in the chase. Two other civilians also joined the chase and the four of them pursued the prowler, though they were unable to apprehend him. The prowler eventually eluded the four when he went over a picket fence farther on down the street. Waddle testified that at that point he recognized the prowler as a tenant whom he knew resided in Resler's apartment, although at the moment he did not know him by name. Apparently, he had seen Resler on other occasions coming in and out of his apartment and working on his automobile near the apartment.

Two other police officers conducted a search of the neighborhood from their cruisers. Those officers, the initial responding officer, and the several civilians then reconnoitered in the parking lot outside Resler's apartment to consider what to do. A radio call had been made for Sergeant Murphy pursuant to his earlier request.

At approximately 1:05 a.m. on the morning of December 11, 1979, Sergeant Murphy arrived at the scene. The other officers present briefed Murphy on what had happened, including the fact that Waddle believed that he struck Resler when he fired at him. At this point an investigation of the outside of Resler's apartment was made and it was discovered that the apartment door was open. There were no lights on in Resler's apartment. Though no one had reported any person entering or leaving Resler's apartment, it is clear that during the time of the chase it was possible for someone to have doubled back and gone into Resler's apartment without being seen. At this point in time, Sergeant Murphy determined to enter Resler's apartment, believing that Resler had been shot and was in need of first aid.

Upon entering the apartment the officers did not find Resler present but did observe in plain view a host of items previously reported stolen in the burglaries, as well as several pairs of women's panties later used to link Resler with several unsolved sexual offenses. Nothing was seized during this entry and the officers made no effort to search the apartment except to quickly observe what was in plain sight. Realizing that Resler was not in the apartment, they immediately withdrew and sought to obtain a search warrant for the apartment. The search warrant was obtained based upon what they had observed in clear view. The first search warrant was issued at about 4:10 p.m. on December 11, 1979. It was served, and items were seized from Resler's apartment at approximately 4:30 p.m. the same day. A second search warrant was issued and served on the morning of December 13, 1979. The second search warrant was made necessary because the officers did not list in the first warrant all of the items they wanted to seize from the apartment.

Resler maintains that the search warrant was obtained with information resulting from an illegal entry into his apartment and therefore the evidence obtained

was the "fruit of a poisonous tree" and inadmissible at trial. See *Wong Sun v. United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Resler maintains that absent exigent circumstances a law enforcement officer may not enter the residence of a suspect to arrest him or search his home without a warrant or without consent to enter. Resler relies upon *Payton v. New York, Riddick v. New York,* 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), in support of this position.

It is true that both *Payton and Riddick* stand for the proposition that a police officer who has not obtained either an arrest warrant or a search warrant cannot make a nonconsensual and warrantless entry into a suspect's home in the absence of exigent circumstances. The difficulty with Resler's argument is that he fails to recognize the exigent circumstances present in the instant case. While exigent circumstances generally have been defined to exist where the suspect is in a position to flee as when he is in a car, or when the evidence is located in a place or under such conditions that it is likely to be destroyed while a warrant is sought, a further condition has been recognized as an exigent circumstance authorizing a warrantless or nonconsensual entry into a suspect's home. This exception is known as the "emergency doctrine."

The applicability of the "emergency doctrine" as an exigent circumstance was reaffirmed by the U.S. Supreme Court in the recent case of *Mincey v. Arizona,* 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978), wherein the Court said at 392: "We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." The opinion then cites in support of this statement a number of state and federal cases which have specifically articulated the emergency doctrine as it has developed as an exception to the fourth

amendment's warrant requirement.

While no one case seems to have gathered together all the elements of the emergency doctrine, a reading of many of the cases decided in other jurisdictions supports the view taken by one commentator who has defined the doctrine as follows: "Law enforcement officers may enter private premises without either an arrest or a search warrant to preserve life or property, to render first aid and assistance, or to conduct a general inquiry into an unsolved crime, provided they have reasonable grounds to believe that there is an urgent need for such assistance and protective action, or to promptly launch a criminal investigation involving a substantial threat of imminent danger to either life, health, or property, and provided, further, that they do not enter with an accompanying intent to either arrest or search. If, while on the premises, they inadvertently discover incriminating evidence in plain view, or as a result of some activity on their part that bears a material relevance to the initial purpose for their entry, they may lawfully seize it without a warrant. Thus, to qualify as an emergency exception, there must reasonably appear to exist an exigency in the course of which a discovery related to the purpose of the entry is made. The exigent circumstances legitimate the presence, and the relevance of the discovery to the justification for the entry sanctions the seizure." See Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment*, 22 Buffalo L. Rev. 419, 426-27 (1973).

One of the cases specifically cited by the U.S. Supreme Court in *Mincey* is the case of *Root v. Gauper*, 438 F.2d 361 (8th Cir. 1971). In the *Root* case the Eighth Circuit said: "For purposes of the instant case, the emergency or exigency doctrine may be stated as follows: police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in dis-

tress and in need of that assistance. In applying this doctrine, two principles must be kept in mind. (1) Since the doctrine is an exception to the ordinary Fourth Amendment requirement of a warrant for entry into a home, the burden of proof is on the state to show that the warrantless entry fell within the exception. [Citations omitted.] (2) An objective standard as to the reasonableness of the officer's belief must be applied.

"'* * * [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. * * * And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' Terry v. Ohio, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889 (1968)." *Root v. Gauper, supra* at 364-65.

One of the most often-cited cases involving the "emergency doctrine" is the case of *People v. Mitchell*, 39 N.Y.2d 173, 347 N.E.2d 607, 383 N.Y.S.2d 246 (1976), *cert. denied*, 426 U.S. 953, 96 S. Ct. 3178, 49 L. Ed. 2d 1191 (1976). In the course of its opinion, the *Mitchell* court set out some helpful guidelines for the application of the emergency doctrine, saying at 248-49, 347 N.E.2d at 609-10: "[W]e think it necessary to articulate some guidelines for the application of the 'emergency' doctrine. The basic elements of the exception may be summarized in the following manner: (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the

area or place to be searched.

"The first requisite is that the police have valid reasons for the belief that an emergency exists, a belief which must be grounded in empirical facts rather than subjective feelings . . . .

"The second requirement is related to the first in that the protection of human life or property in imminent danger must be the motivation for the search rather than the desire to apprehend a suspect or gather evidence for use in a criminal proceeding. . . .

"Finally, the limited privilege afforded to law enforcement officials by the emergency exception does not give them carte blanche to rummage for evidence if they believe a crime has been committed. There must be a direct relationship between the area to be searched and the emergency."

For other cases supporting the "emergency doctrine" as an exigent circumstance, see, *United States v. Goldenstein*, 456 F.2d 1006 (8th Cir. 1972); *State v. Jones*, 608 P.2d 1220 (Or. App. 1980); *Horack v. Superior Court*, 3 Cal. 3d 720, 478 P.2d 1, 91 Cal. Rptr. 569 (1970); *People v. Smith*, 7 Cal. 3d 282, 496 P.2d 1261, 101 Cal. Rptr. 893 (1972); *State v. Matsen*, 287 Or. 581, 601 P.2d 784 (1979); *State v. Beede*, 119 N.H. 620, 406 A.2d 125 (1979), *cert. denied*, __U.S.__, 100 S. Ct. 1659, 64 L. Ed. 2d 244 (1980), *rehearing denied*, __U.S.__, 100 S. Ct. 2980, 64 L. Ed. 2d 850 (1980); *Shepherd v. State*, 343 So. 2d 1349 (Fla. App. 1977); *State v. Pires*, 55 Wis. 2d 597, 201 N.W.2d 153 (1972); *United States v. Presler*, 610 F.2d 1206 (4th Cir. 1979); *State v. Sanders*, 8 Wash. App. 306, 506 P.2d 892 (1973); *People v. Hill*, 12 Cal. 3d 731, 528 P.2d 1, 117 Cal. Rptr. 393 (1974); *State v. Campbell*, 15 Wash. App. 98, 547 P.2d 295 (1976); *State, etc. v. District Court, etc.*, 591 P.2d 656 (Mont. 1979); *State v. Monroe*, 101 Idaho 251, 611 P.2d 1036 (1980); *Patrick v. State*, 227 A.2d 486 (Del. 1967); *State v. Theodosopoulos*, 119 N.H. 573, 409 A.2d 1134 (1979), *cert. denied*, __U.S.__, 100 S. Ct. 2964, 64 L. Ed. 2d 839

(1980); *People v. Lovitz,* 39 Ill. App. 3d 624, 350 N.E.2d 276 (1976), *cert. denied,* 434 U.S. 842, 98 S. Ct. 141, 54 L. Ed. 2d 107 (1977); *People v. Kepi,* 65 Ill. App. 3d 327, 382 N.E.2d 642 (1978).

We believe the guidelines of the *Mitchell* case, as well as the principles announced in the *Root* case, are fully applicable and present in the instant case sufficient to have justifiably created an exigent circumstance which allowed the officers to enter Resler's apartment without a warrant and without consent.

In the instant case, it is apparent that Murphy and the other officers had justifiable reason to believe that Resler had been shot and wounded and was in need of emergency first aid. Waddle reported that he had fired at Resler and Resler had fallen to the ground. When Murphy and the other officers arrived at Resler's apartment in the early morning of December 11, 1979, they found Resler's door open, without any apparent explanation. They could have reasonably concluded, as they did, that Resler was wounded and had returned to the apartment, perhaps too weak to either close the door or turn on a light. They were therefore justified in believing that an emergency existed in which they had an obligation to enter the apartment, find Resler, and provide him necessary first aid.

It is likewise clear from the evidence that they had no intent to arrest Resler or to make any search of the apartment. This is apparent by their behavior both at the apartment and later that day when they found Resler at his mother's home. The moment they determined that Resler was not present they left the apartment. They made no effort to try to determine whether there was any property located anywhere else not in plain view, and made no effort to seize any property, including the property in plain view. Furthermore, when they found Resler later that morning at his mother's home he was not arrested even though he had been identified as the primary suspect. He was not arrested until sometime after December 11, 1979.

Finally, they had a reasonable basis, approximating probable cause, to associate the emergency with the place to be searched. It was completely reasonable to assume that a person shot as a prowler and therefore unable to seek emergency aid from a doctor or hospital without giving himself up would seek cover in his own apartment located immediately in the area where he was shot and where he was last seen.

All of these factors taken into account make it clear that the officers did not have an intent to arrest or to make an unreasonable search when they entered Resler's apartment and, in fact, had but a single interest: providing Resler with emergency aid, if necessary. That action falls completely within the emergency doctrine exception to the fourth amendment prohibition against warrantless, nonconsensual searches. The trial court was entirely correct in refusing to suppress the evidence seized through the warrants obtained by reason of the officers' entry into Resler's apartment, and there is no error.

Resler has assigned two other alleged errors which can be quickly disposed of, the most serious problem presented having now been addressed. Resler maintains that the trial court erred in not granting a motion for directed verdict on the grounds of insufficient evidence. An examination of the record discloses that there was ample evidence of property and underclothing in Resler's apartment belonging to victims of the burglaries and sexual assaults. In addition, there was other evidence, including samples of Resler's pubic hair, blood, and saliva which connected him with the sexual assaults, as well as evidence from the victims of the assaults who identified Resler as the individual who committed the assaults upon them. To be sure, there was a dispute about those facts, but, nevertheless, there was sufficient evidence upon which the jury could justifiably find Resler guilty. In *State v. Pena*, 208 Neb. 250, 253, 302 N.W.2d 735, 737 (1981), we said: "[T]he verdict of a jury must

be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it." We further said in *Pena, supra* at 253, 302 N.W.2d at 737: "[I]n determining the sufficiency of the evidence to sustain a conviction in a criminal prosecution, it is not the province of this court to resolve conflicts in the evidence, pass upon the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence, as such matters are for the jury." To the same effect, see *Vanderheiden v. State*, 156 Neb. 735, 57 N.W.2d 761 (1953). Examining the record as a whole, we are unable to say that the jury was not justified in reaching the conclusions it did. That being the case, we are not at liberty to undo the findings of the jury.

The last assignment raised by Resler is to the effect that the sentences imposed are excessive. The crimes in these cases were serious and displayed both a plan to engage in crime and a plan to totally disregard one's responsibility to abide by the mores of the community. The sentences are well within the statutory limits and we have repeatedly held that a sentence imposed within statutory limits will not be disturbed on appeal absent a clear abuse of discretion. See *State v. Kramer*, 203 Neb. 658, 279 N.W.2d 634 (1979). We are unable to find any evidence of an abuse of discretion and are therefore duty-bound to affirm the sentence.

Having found that all of Resler's assignments of error must be overruled, we therefore affirm the judgment and sentence of the trial court in all respects.

AFFIRMED.