IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. MARSHALL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLANT,

V.

DANIEL S. MARSHALL, APPELLEE.

Filed May 26, 2015.    No. A-15-019.

Appeal from the District Court for Lancaster County: STEPHANIE F. STACY, Judge. Affirmed.

Joe Kelly, Lancaster County Attorney, Patrick F. Condon, and Michael S. Boal, Senior Certified Law Student, for appellant.

Nancy K. Peterson for appellee.

RIEDMANN, Judge.

### INTRODUCTION

Pursuant to Neb. Rev. Stat. § 29-824 (Reissue 2008), the State appeals an order granting a motion to suppress evidence discovered during a warrantless search of a house owned by Daniel S. Marshall. Because the State failed to prove that the police officers had reasonable grounds to believe an emergency existed and that there was an immediate need for their assistance for the protection of life or property, the district court's order is affirmed.

### BACKGROUND

Marshall was charged in the district court for Lancaster County with possession of a firearm by a prohibited person after law enforcement located a firearm in his residence during a welfare check. He moved to suppress all evidence gathered by law enforcement as a result of entering and searching the residence because it violated his right to be free of unreasonable

- 1 -

searches and seizures as guaranteed by the U.S. and Nebraska Constitutions. A suppression hearing was held, during which the following evidence was adduced.

On December 22, 2013, the animal control division for the City of Lincoln received a complaint of an aggressive pit pull running loose in a Lincoln neighborhood. Animal control officer Cheryl Bomberger responded to the call at approximately 12:30 in the afternoon. Bomberger located the animal but was unable to capture it without assistance.

Bomberger was aware from previous contacts that the dog belonged to the residents of a house located at 18th and H Streets, so she approached the home to try to make contact with the owners. She noticed that the storm door of the residence did not latch and that the outer wooden door, which was immediately adjacent to the storm door, was ajar approximately 8 to 10 inches. The evidence showed that the outer wooden door led into a covered porch area which was approximately 4 feet deep and 10 feet wide. At the rear of the covered porch was a second wooden door which led directly into the living area of the residence. Bomberger testified that she did not see the second wooden door initially, but later discovered that it was ajar approximately 8 to 10 inches as well. She knocked on the outer wooden door, but received no response.

Bomberger contacted Lincoln Police due to the fact that the door to the residence was ajar and she knew, based on previous contacts, that a "grandmother" lived in the home. She testified that it was normal practice for animal control to call police to request a welfare check under circumstances such as these, where a door to a residence is ajar and they have reason to believe that the owners of an animal are elderly or handicapped.

Lincoln police officers Michael Pratt and Stacy Pratt were dispatched to the scene. While en route, Officer Stacy Pratt radioed to Officer Michael Pratt that she had previously been to this residence to assist animal control with an aggressive dog complaint and had made contact with a resident by the name of Daniel Marshall, who was issued a citation regarding the dog. When Officer Michael Pratt arrived on scene, Bomberger advised him of the current situation with the dog and expressed her concern about the door being open and the older woman that lived there.

Officer Michael Pratt testified that Bomberger advised him that she recognized the dog from prior contacts and knew that it belonged to the residents at a particular house at 18th and H Streets. Bomberger further advised him that she had tried to make contact with the residents by knocking on the door and by telephone, but was unable to reach anyone. According to Officer Michael Pratt, Bomberger indicated that an elderly woman with "some health problems" lived there, and Bomberger was concerned that maybe the woman was incapacitated or in need of assistance; however, Bomberger did not indicate to Officer Michael Pratt the nature of the woman's health problems, how she became aware of this information, or when she had last seen this woman.

Officer Stacy Pratt arrived on scene shortly thereafter. She testified that Officer Michael Pratt was already involved in a conversation with Bomberger when she arrived, so she only heard part of their conversation. According to Officer Stacy Pratt, Bomberger stated that she was aware of an elderly woman that lived at the residence that "might have some health issues." However, during the suppression hearing, Bomberger acknowledged that she had not seen the woman at the residence since 2010, and did not have any information regarding the woman's health issues on the date in question, nor any specific knowledge about her physical condition.

Both officers testified that the dog was very aggressive, and was growling, barking, and showing its teeth as it charged toward them, causing Officer Michael Pratt to draw his firearm for protection. A second animal control officer arrived shortly thereafter, and they were able to confine the dog.

Once the dog was safely confined, Officers Michael and Stacy Pratt approached the house and noticed that the interior wooden door was slightly ajar. They testified that there was a storm door with a glass front that led into a small vestibule porch area. Through the glass storm door, they could see the interior wooden door that appeared to lead into the house. Neither officer remembered seeing the first wooden door immediately adjacent to the storm door, and testified that it must have either been wide open or not attached that day. Officer Michael Pratt testified that the interior wooden door was ajar approximately 4 to 5 inches, which caused him concern. Officer Stacy Pratt estimated that the door was 5 to 10 inches ajar. The officers knocked on the door and shouted their presence several times, but received no response. They decided to make entry into the house to check if there was an elderly woman in need of assistance.

Upon entering the residence, the officers made a cursory search of the upper level and basement areas looking for anyone that might be in need of assistance. While walking through one of the upstairs bedrooms, Officer Michael Pratt noticed a semi-automatic handgun sitting on a closet shelf at eye level, as well as a magazine with ammunition. He testified that the closet did not have a door and he did not have to move any items on the closet shelf in order to see the gun or the ammunition. Officer Stacy Pratt testified that she too could see directly into the closet, but she could not recall whether the closet door was open or there simply was no door. At that point, neither officer touched or moved the gun, but instead continued their search of the house.

After searching the remainder of the house and finding no one, both officers returned to the bedroom where they had observed the gun. Officer Michael Pratt picked up the gun, copied down its make, model, and serial number, and then placed it back on the closet shelf. When asked why he did that, he responded, "I don't know; just curious." The officers then secured the doors and exited the residence.

Immediately upon leaving, Officer Michael Pratt called to check the criminal history of the defendant, Daniel Marshall, which revealed that he was a convicted felon. Officer Michael Pratt testified that he decided to check Marshall's criminal history because he suspected there was a possibility that he may be a convicted felon based on the information he had received earlier that day from Officer Stacy Pratt. Officer Michael Pratt then checked the status of the gun and discovered that it had been reported stolen. However, he acknowledged that at the time he observed the gun, he had no reason to believe that it was stolen or that anyone residing in the house was a convicted felon.

Law enforcement obtained and executed a search warrant later that day, during which the gun and ammunition were seized from the residence, as well as four pieces of mail to prove Marshall's occupancy. Officer Michael Pratt acknowledged that when drafting the search warrant affidavit, he did not allege that the elderly woman was a resident of the house or that she had health concerns.

Following the suppression hearing, the district court issued a written order granting Marshall's motion to suppress. It found the State failed to prove that the officers had reasonable grounds to believe an emergency existed, and that the search of the closet shelf while inside the

home far exceeded the reasonable scope of a welfare check for an elderly resident in distress. The State timely appeals from the district court's decision.

## ASSIGNMENTS OF ERROR

The State assigns that the district court erred in finding that the officers' entry into the residence was not justified by the emergency doctrine and in granting Marshall's motion to suppress.

## STANDARD OF REVIEW

An appellate court will uphold the trial court's ruling on a motion to suppress unless the trial court's finding of fact are clearly erroneous. *State v. Eberly*, 271 Neb. 893, 716 N.W.2d 671 (2006). In making this determination, the appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and considers the trial court observed the witnesses testifying in regard to such motions. *Id.* In cases involving exigent circumstances, the trial court's conclusion as to whether the facts, when viewed from the standpoint of an objectively reasonable police officer, establish the existence of probable cause or the presence of exigent circumstances, must be reviewed de novo. See *id.*

## ANALYSIS

The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Rodriguez*, 288 Neb. 878, 852 N.W.2d 705 (2014). A police officer who has obtained neither an arrest warrant nor a search warrant cannot make a nonconsensual and warrantless entry into a suspect's home in the absence of exigent circumstances. *State v. Eberly, supra*, citing *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990); *State v. Resler*, 209 Neb. 249, 306 N.W.2d 918 (1981). Exigency determinations are generally fact intensive, but several commonly recognized categories include:

> (1) 'hot pursuit' of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to [an occupant].

*State v. Eberly, supra.*

At issue in this appeal is the fourth category, which is also called the "emergency doctrine." One rationale for the emergency doctrine is "to allow police officers [to] enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990) (internal citations and quotations omitted). See also, *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (stating that police may make warrantless entries on premises where the police "reasonably believe that a person within is in need of immediate aid.").

The Nebraska Supreme Court has summarized the elements of the emergency doctrine as follows: (1) the police must have reasonable grounds to believe an emergency exists and an immediate need for their assistance for the protection of life or property; (2) the search must not be primarily motivated by intent to arrest and seize evidence; and (3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place

to be searched. *State v. Eberly, supra.* However, we no longer consider whether a search is primarily motivated by an intent to arrest and seize evidence, as the U.S. Supreme Court has since clarified that an officer's subjective motivation is irrelevant in determining whether that officer's actions violate the Fourth Amendment. See *id.*, citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).

When applying the emergency doctrine, the Nebraska Supreme Court has stated that two principles must be kept in mind:

> (1) Since the doctrine is an exception to the ordinary Fourth Amendment requirement of a warrant for entry into a home, the burden of proof is on the state to show that the warrantless entry fell within the exception. . . . (2) An objective standard as to the reasonableness of the officer's belief must be applied.
>
> . . . [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

*State v. Eberly, supra*, citing *State v. Resler*, 209 Neb. at 255, 306 N.W.2d at 922-23.

The Nebraska Supreme Court has condoned warrantless searches of a residence on occasion. See e.g. *State v. Eberly*, 271 Neb. 893, 716 N.W.2d 671 (2006); *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990); and *State v. Resler*, 209 Neb. 249, 306 N.W.2d 918 (1981)(first acknowledging the emergency doctrine for warrantless entry in Nebraska).

In *State v. Eberly, supra*, the Supreme Court affirmed an order denying the defendant's motion to suppress on the basis that the emergency doctrine justified the warrantless entry. In that case, officers had been dispatched to a house with information that a neighbor reported a burglary at the residence. Neighbors saw a man in Eberly's back yard, heard a loud bang, and saw 2 men run away carrying a white bag. Upon arrival at the home, the officers could see that the back door had been forced open and no one responded to their announcement as police officers. The police entered the home to ensure that no victims or suspects remained inside. While in the house, they discovered a marijuana-growing operation. After securing a search warrant, they seized the evidence. The defendant filed a motion to suppress which the district court denied.

On appeal, the Nebraska Supreme Court upheld the district court's determination that the officers had a reasonable objective basis to believe that someone inside the house may need their assistance because the "bang" described by the neighbor could have been a gun shot or evidence of an assault. To wait for a search warrant could have led to further deterioration if a person inside was wounded.

In *State v. Plant, supra*, police officers entered the Plant's home without a warrant after gaining knowledge that three young children were unaccounted for and had been left unattended for several hours. As a result of their search, the police officers located the missing children inside who later made statements incriminating Plant in a pending child abuse case. Plant sought to have these statements suppressed as fruit of the poisonous tree. The district court refused to suppress the evidence and the Nebraska Supreme Court affirmed.

In reaching its decision, the Supreme Court noted that before entering the Plant's home, the police had information that three young children were unaccounted for and had been left unattended for several hours. They were aware that Plant had given misinformation to police officers regarding his and the children's whereabouts. The officers were also familiar with a report to police that one of the children had suffered continual abuse by Plant and another child was in critical condition because of his injuries. The court concluded that all of this evidence was gathered from reliable sources and provided reasonable grounds to believe that an emergency existed and there was an immediate need for police assistance for the protection of the three children.

Unlike *Eberly* and *Plant*, at the time the officers entered Marshall's house, they had no reasonable basis to believe that someone was in the house, much less that the person inside was in distress. The only information they had was that an elderly woman who had, or may have, health problems lived there. A dog was at large and the inside door was ajar. While Bomberger surmised that the dog may have knocked over the woman before it escaped from the house, there were no specific articulable facts to support that conjecture.

The State relies upon *U.S. v. Quezada*, 448 F.3d 1005 (8th Cir. 2006), in support of its argument that the police officers had reasonable grounds to believe an emergency existed. In *Quezada*, a deputy sheriff arrived at an apartment to serve the resident with a child protection order. Although the door to the apartment was closed, the latch was not engaged, causing the door to open slightly when the deputy knocked on it. Through the gap in the door, the deputy could see that the lights were on in the apartment and he heard a television playing. He shouted into the apartment several times to announce his presence, but received no response. After radioing these details to the dispatcher, the deputy drew his weapon and entered the apartment. The defendant was found inside the apartment in possession of a firearm, and further investigation revealed that he was a convicted felon. He was subsequently charged with being a felon in possession of a firearm, and moved to suppress evidence of the gun on grounds that the deputy entered the apartment unlawfully.

The Eighth Circuit held that the deputy was justified in entering the apartment because he was acting within his role as a community caretaker, and therefore, his decision to enter the apartment could not be judged by the same standard as if he were entering the apartment to search for criminal activity. *Id.* at 1007. Instead, the court explained, "[a] police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention." *Id.*, citing *Mincey v. Arizona*, 437 U.S. 385, 392-93, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The court further explained that the "reasonable belief" standard, which is used when determining whether an officer may enter a residence as a community caretaker, "is a less exacting standard than probable cause." *Id.*, citing *Maryland v. Buie*, 494 U.S. 325, 336-37, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

Based on this framework, the court held that the deputy's entry into the apartment "violated the fourth amendment only if no reasonable officer could have believed that an emergency was at hand." *Id.* at 1008. It noted that if the apartment had appeared quiet and dark, it might have been reasonable to assume the tenant had simply not closed the door securely before leaving; but because the lights and television were on, the circumstances suggested that someone was home. *Id.* Additionally, because the deputy shouted into the apartment several times and did not receive a response, "a reasonable officer in the deputy's position could conclude that someone was inside

but was unable to respond for some reason." *Id.* Thus, the court concluded that the deputy's decision to enter the apartment was reasonable and did not violate the Fourth Amendment.

The facts before us in this case differ from those of *Quezada.* In *Quezada*, the court specifically noted that because the lights and television were on, it was reasonable to believe someone was home. Here, there was no such evidence. Moreover, the Eighth Circuit has adopted a "community caretaker exception" for warrantless searches of residences, whereas the Nebraska Supreme Court has recognized such an exception only in the context of automobile searches. *State v. Blakewell*, 273 Neb. 372, 730 N.W.2d 335 (2007). See also Megan Pauline Marinos, Comment, *Breaking and Entering or Community Caretaking? A Solution to the Overbroad Expansion of the Inventory Search,* 22 Geo. Mason U. Civil Rights L.J. 249, 261 (2012)(discussing differences between the community caretaker exception and the emergency exception). In adopting the community caretaker exception for warrantless searches of automobiles, our Supreme Court has emphasized its narrow application. *Id*. Therefore, *Quezada* is not only distinquishable on its facts, but its analysis is inapplicable.

Applying the above principles, it was the State's burden to prove the police officers had reasonable grounds to believe that a person was inside the home who was in distress and in immediate need of their assistance for the protection of life or property. As described by the district court, the evidence was scant and largely surmised. Therefore, I agree with the decision of the district court that the police officers' entry into the residence was not justified by the emergency doctrine and violated Marshall's Fourth Amendment rights. I therefore affirm the decision granting Marshall's motion to suppress.

CONCLUSION

For the reasons explained above, the trial court's order is affirmed and the matter is remanded for further proceedings.

AFFIRMED.