Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/12/2016 09:05 AM CDT

State of Nebraska, appellee, v.
Paul J. Turner, appellant.

___ N.W.2d ___

Filed April 12, 2016.    No. A-15-472.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Constitutional Law: Search and Seizure.** It is well settled under the Fourth Amendment that warrantless searches and seizures are per se unreasonable, subject to a few specifically established and well-delineated exceptions.

3. ____: ____. A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

4. **Police Officers and Sheriffs: Search and Seizure.** In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

5. **Search and Seizure: Duress.** Consent to search must be voluntarily given and not the result of duress or coercion, whether express, implied, physical, or psychological.

6. ____: ____. In examining all the surrounding circumstances to determine if in fact a consent to search was coerced, account must be taken

of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.

7. **Search and Seizure.** Where both occupants of a jointly occupied premises are physically present, the consent of one occupant to a search is insufficient when the other occupant objects to the search.

8. \_\_\_\_. The determination of whether consent to search is voluntarily given is a question of fact to be determined from the totality of the circumstances.

9. **Search and Seizure: Proof.** The burden is upon the government to prove that a consent to search was voluntarily given.

Appeal from the District Court for Hall County: William T. Wright, Judge. Affirmed.

Charles R. Maser for appellant.

Douglas J. Peterson, Attorney General, and George R. Love for appellee.

Moore, Chief Judge, and Inbody and Bishop, Judges.

Bishop, Judge.

Following a bench trial in the district court for Hall County, Paul J. Turner was convicted of possession of a controlled substance (methamphetamine), a Class IV felony, see Neb. Rev. Stat. § 28-416(3) (Cum. Supp. 2014); possession of drug paraphernalia, an infraction, see Neb. Rev. Stat. § 28-441 (Reissue 2008); and possession of marijuana of 1 ounce or less, an infraction, see § 28-416(13)(a). He appeals, contending the district court erred in overruling his pretrial motion to suppress evidence seized during an allegedly unconstitutional search of his apartment. He further argues that without the evidence resulting from the search, there was insufficient evidence to establish his guilt. We affirm.

## BACKGROUND

On January 21, 2014, Turner was charged by information in the district court for Hall County with possession of a

methamphetamine (count I), possession of drug paraphernalia (count II), and possession of 1 ounce or less of marijuana (count III). In a separate information filed in the district court for Hall County on the same date, Turner's girlfriend, Shannon K. Bond, was charged with possession of methamphetamine. Turner's and Bond's offenses allegedly occurred on December 3, 2013, in Hall County, Nebraska.

On May 14, 2014, Turner filed a motion to suppress evidence seized during an allegedly unconstitutional search of his apartment on December 3, 2013. He further requested that any statements he made be suppressed, alleging the statements were not freely and voluntarily made. On May 28, 2014, Bond filed a nearly identical motion to suppress in her case.

Turner and Bond, both of whom were represented by counsel, agreed to a consolidated evidentiary hearing on their motions to suppress; the hearing was held on July 17, 2014. Investigator Sarah Mann of the Grand Island Police Department testified as follows: On December 2, 2013, she went to an address on North Walnut Street in Grand Island, Nebraska, in response to a child abuse hotline intake indicating possible drug use in front of minor children at the address. Upon arriving, she knocked on the door and heard no response. She returned around 1 p.m. the next day, December 3, with Chelsea Willden, an employee of the Nebraska Department of Health and Human Services (DHHS). Investigator Mann realized the door on which she had knocked the prior day led to a staircase, and she opened the door and ascended the stairs. At the top of the stairs was the door to an apartment. She knocked on the door and heard a male voice say, "Come in." She continued knocking, and Turner opened the door.

According to Investigator Mann, she identified herself and Willden, explained they had received a complaint, and asked if they could "come in and chat with him about it." Turner said yes and invited them inside. Mann and Willden talked to Turner about the allegations, and then Bond exited a bedroom

and joined the conversation. Mann and Willden explained the allegations to Bond. At some point during this interaction, Investigator Mann saw an individual whom she identified as Dennis Castro sitting in the living room; she learned that Castro had a warrant for his arrest and requested a patrol unit to transport Castro to the jail. Waiting for the patrol unit "took up some time."

After Castro was transported away, Royal Kottwitz, another investigator with the Grand Island Police Department, noticed a backpack on the living room floor. (On cross-examination, Mann clarified that Investigator Kottwitz was with her and Willden when they arrived at the apartment on December 3, 2013.) Neither Turner nor Bond knew who owned the backpack, and both agreed it could be searched. Upon opening the backpack, Investigator Mann located among other items a hypodermic needle, a small baggie of what appeared to be marijuana, and a glass pipe with white residue. Based on her training and experience, Investigator Mann believed the glass pipe was a "meth pipe."

Investigator Mann explained that after finding the items in the backpack, there was a discussion about consent to search the apartment. Bond wanted to give consent, but Turner did not. There was a discussion "amongst officers" about whether to seek a search warrant. Bond then asked if she could go to the bathroom and asked Investigator Mann to accompany her. In the bathroom, Bond "was pretty worked up" and told Investigator Mann she would give up "everything" and "wanted to know if that would kind of make all this go away." Investigator Mann told Bond she could not answer that question because she did not know what Bond had. The two women left the bathroom, and Bond led Investigator Mann into the bedroom, where Bond pulled two pipes and a baggie out of her purse. Bond handed the pipes to Investigator Mann and said, "This is my marijuana pipe," and, "This is my meth pipe." The baggie had a white residue that appeared to be methamphetamine.

After Bond handed the items to her, Investigator Mann told Bond she still wanted to search the apartment. They returned to the living room, and Bond conversed with Turner. According to Investigator Mann, Turner and Bond could not agree whether to give consent and "kind of went back and forth." Every now and then, Investigator Mann would tell them "time's ticking" and ask for a decision. Eventually, Investigator Mann informed Turner and Bond she was leaving to apply for a search warrant, but Bond asked her to wait. After Turner and Bond still could not reach a decision, Investigator Mann said "time's up" and left to seek a search warrant. Prior to leaving, she patted Turner down for weapons, but located none.

Investigator Mann testified that Officer Wesley Tjaden arrived to "stand by to make sure no evidence was destroyed" while she sought a search warrant. Investigator Mann returned to the police department and had nearly completed her warrant application when Officer Tjaden called to inform her that Turner and Bond had decided to consent to the search. Investigator Mann, who had not completed the warrant application, returned to the apartment, and Turner and Bond verbally consented to a search and signed consent-to-search forms. The forms were received into evidence; Bond signed her form at 4:05 p.m., and Turner signed his form at 4:10 p.m.

During the subsequent search of the apartment, Investigator Mann located a makeup or cosmetic bag containing drug paraphernalia and what she believed to be methamphetamine. The bag was located in a magazine rack in the master bedroom, on the side of the bed that Bond indicated was hers. In the nightstand on the other side of the bed, Investigator Kottwitz located a glass marijuana pipe, a marijuana grinder, two broken glass pipes, and a "blue pencil torch." Other drug-related items were located in other places in the master bedroom, including a baggie containing a white crystalline substance on the desk and folded up tinfoil with white residue in the trash can.

Investigator Mann testified that after locating the items during the search, she gave Turner warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and that he signed a form waiving his rights. The form was received into evidence and indicated Turner signed the form at 5:15 p.m. When Investigator Mann then asked Turner if the items in the magazine rack were his, Bond spoke up and said they were hers. Investigator Mann placed Turner and Bond under arrest.

Upon further questioning, Investigator Mann testified that when she returned to the apartment after leaving to prepare the search warrant application, Officer Tjaden told her Turner had been "manipulating something in his pocket" the entire time she was gone. Investigator Mann asked for consent to search Turner's person, and he denied consent. Later, either before or after Turner signed the consent-to-search form (Investigator Mann believed it was after but she was not sure), Turner "stuck his hands in his pocket real quick," and the investigators asked him to remove his hands. At that point, Turner said he was going to empty his pockets, which he did. Turner pulled out a black bag with two glass pipes with white residue, two metal "pen pipes," seven baggies with white residue, a baggie with a white crystalline substance, and two cell phones.

On cross-examination, Investigator Mann testified that prior to going to Turner and Bond's apartment, she and Willden interviewed Turner's 10- and 11-year-old sons at their schools. Neither boy reported witnessing drug use at home. Investigator Mann also spoke with the boys' mother (who was not Bond), and the mother expressed concern that Turner and Bond were "currently using." The mother, who had custody of the boys, did not know what occurred during the boys' visits with Turner.

Also on cross-examination, Investigator Mann explained that the door on which she knocked on December 2, 2013, was "an outside door off the sidewalk of the business district" in Grand Island. Although she did not recall there being a doorbell, she

was shown her police report in which she reported that she rang a doorbell next to the outside door. When she returned on December 3, she realized that because the apartment was in a business district, the door must lead to a staircase to the upstairs apartment. When she opened the door, she saw an enclosed staircase leading to another door. The stairs did not appear to be the interior of someone's home. She did not recall seeing any personal belongings on the stairs.

Investigator Mann also explained that when she discussed the allegations of the hotline report with Turner and Bond, they showed her the children's sleeping area and Turner and Bond's food supply in the kitchen. Nothing Investigator Mann saw caused her concern over the children's care.

Still on cross-examination, Investigator Mann estimated that when Turner and Bond were discussing whether to consent to a search of the apartment, she inquired three to four times as to whether they had made a decision.

Officer Tjaden testified that on December 3, 2013, he was called to an apartment on North Walnut Street in Grand Island to arrest Castro and transport him to jail. After he transported Castro, he returned to the apartment to "stand at the residence" while Investigator Mann obtained a search warrant. After Investigator Mann left, the only persons in the apartment were Officer Tjaden, Turner, and Bond. Officer Tjaden stood in the doorway of the living room, and Turner and Bond sat on the couch in the living room. Neither Turner nor Bond asked or attempted to leave, and the officer did not tell them they were not free to do so. Officer Tjaden observed Bond "begging and pleading" with Turner to give consent to search the apartment. The officer never discussed the subject of consent to search with them. At some point, Turner and Bond told the officer they had decided to give consent to search. He radioed Investigator Mann to return to the apartment. Officer Tjaden estimated he was at the apartment for 45 minutes to 1 hour during the time Investigator Mann was preparing her search warrant application.

On cross-examination, Officer Tjaden recalled seeing "stuff lined up on either side of the stairwell," but he did not remember what it was. He also testified he was 6 feet 3 inches tall and weighed close to 260 pounds. While in the apartment, he was in full uniform with his service weapon displayed on his person.

The State rested, and Turner and Bond called Willden as their first witness. Willden's testimony concerning the events of December 2 and 3, 2013, was largely consistent with Investigator Mann's testimony. However, she testified that Bond answered the apartment door, not Turner as Investigator Mann testified. Willden testified that following the visit to the apartment, DHHS closed the investigation into the hotline report as "unfounded."

Turner and Bond next called Investigator Kottwitz. He testified that when he arrived at the apartment with Investigator Mann and Willden on December 3, 2013, they were unsure whether the street-level door "led to the residence or led to multiple apartments on the second level." Investigator Kottwitz testified he opened the unlocked door and saw a stairway leading to a second door. He recalled seeing "minimal property" on the stairs. The remainder of his testimony was consistent with Investigator Mann's testimony.

On August 14, 2014, the court entered a written order overruling Turner's and Bond's motions to suppress. The court found that when the investigators and Willden approached the apartment for purposes of inquiring about the hotline report, they were engaging in a "'knock and talk'" and did not require a warrant. The court further found that while one might argue the stairway was part of the "'curtilage'" of the apartment, there was no indication Turner and Bond had a reasonable expectation of privacy in the stairway, and the evidence suggested it was expected for a visitor to climb the stairway and knock on the upstairs door. The court noted Turner's lack of surprise when Investigator Mann knocked on the upstairs door, given that Turner's response was "'come in.'"

Turning to the issue of consent to search, the court found that either Turner or Bond consented to the initial entry into the apartment. The court then found that Turner and Bond consented to the search of the backpack and that Bond invited Investigator Mann to the bathroom and bedroom, where Bond gave Investigator Mann drug paraphernalia and items with drug residue on them. Even though Turner had not consented to a search of the apartment at that time, the court noted that Turner was not the target of a search when Investigator Mann accompanied Bond to these areas and that Bond had "'common authority'" over the apartment.

Addressing the ultimate search of the entire apartment, the court found it to be the only "potentially problematic" search. The court noted Turner and Bond did not sign the consent-to-search forms until law enforcement officials had been in and out of the apartment for approximately 3 hours. This time period was prolonged due to Castro's arrest, the discussion between Turner and Bond regarding consenting to the search, and Investigator Mann's departure to seek a search warrant. The court found that "the vast majority of the time officers spent in the residence was the result of Bond's efforts to secure Turner's consent." Furthermore, the court found that "[i]f anyone overbore Turner's will, it was Bond, not the officers in question." The court upheld the consensual search of the apartment.

The court also found no constitutional violations in Turner's act of voluntarily emptying his pockets. In addition, the court found that any statements made by Turner and Bond either were volunteered without custodial inquiry or followed the voluntary waiver of rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

At Turner and Bond's request, the matter proceeded to a consolidated bench trial on December 22, 2014. Investigators Mann and Kottwitz testified consistently with their testimony at the suppression hearing. In addition, a forensic scientist from the Nebraska State Patrol crime laboratory testified concerning

her testing of the suspected drugs seized from the apartment, which tested positive for marijuana and methamphetamine. After an evidence technician provided testimony concerning the chain of custody, the drugs and drug paraphernalia seized from the apartment were received into evidence.

The court found Turner guilty of possession of methamphetamine (count I), possession of drug paraphernalia (count II), and possession of 1 ounce or less of marijuana (count III). After the court sentenced Turner to 20 to 60 months' imprisonment on count I, and fines of $100 each on counts II and III, Turner timely appealed to this court.

## ASSIGNMENTS OF ERROR

Turner assigns (1) that "[t]here was insufficient evidence to sustain the conviction," (2) that his motion to suppress "should have been sustained," and (3) "[a]ny other improper evidentiary rulings that took place during the Trial." Because Turner offers no argument in support of his third assignment of error, we do not consider it. See *State v. Huston*, 291 Neb. 708, 868 N.W.2d 766 (2015) (to be considered by appellate court, alleged error must be specifically assigned and argued). Furthermore, Turner's only argument in support of his first assignment of error is that without the evidence challenged in his motion to suppress, there was no evidence to prove his guilt of the offenses charged; he does not contend that the evidence, if properly admitted, was insufficient. Therefore, the success of Turner's appeal hinges on his second assignment of error.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review. *State v. Wells*, 290 Neb. 186, 859 N.W.2d 316 (2015). Regarding historical facts, we review the trial court's findings for clear error. *Id*. But whether those facts trigger or violate Fourth Amendment protections

is a question of law that we review independently of the trial court's determination. *Id.*

## ANALYSIS

Turner challenges the search of his and Bond's apartment on a number of grounds. He contends that after Investigator Mann and Willden interviewed Turner's sons, they should have ceased their investigation into the hotline report of possible drug use in front of the children; he maintains law enforcement did not have probable cause to continue the investigation beyond that point. He further argues the investigators "without authorization entered what should be considered a porch area wherein they should not have entered without invitation." Brief for appellant at 16. He contends the 3-hour period during which law enforcement was in the apartment prior to obtaining consents to search was an unreasonable and "excessively long seizure and detention." *Id.* Turner asserts his and Bond's wills were overborne, resulting in coerced consents.

[2] It is well settled under the Fourth Amendment that warrantless searches and seizures are per se unreasonable, subject to a few specifically established and well-delineated exceptions. *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001). One well-recognized exception is a search undertaken with consent. *Wells, supra*. To be effective under the Fourth Amendment, consent must be voluntary; in other words, it must be a free and unconstrained choice, not the result of a will overborne. See *Tucker, supra*. In addition, where a consensual search follows an illegal entry, as Turner alleges occurred here, a court must determine whether the consent was an exploitation of the prior illegality. See *State v. Gorup*, 279 Neb. 841, 782 N.W.2d 16 (2010). The search will be upheld only if the State has shown a sufficient attenuation, or break in the causal connection, between the illegal conduct and the consent to search. See *id.* Because any illegality in the investigators' entry into the stairway or apartment will require

us to address the issue of attenuation, we address the legality of the entries before addressing the voluntariness of the consents to search.

We begin with the entry into the stairway leading to the upstairs apartment door. The Nebraska Supreme Court has explained that the degree of privacy society is willing to accord an apartment hallway depends on the facts, such as whether there is an outer door locked to the street which limits access, the number of residents using the hallway, the number of units in the apartment complex, and the presence or absence of no trespassing signage. *State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805 (1999). In this case, the upstairs apartment was located in a business district and the street-level door was unlocked. However, the street-level door led to one apartment only; thus, the stairway was not shared among multiple tenants. Turner suggests the enclosed stairway "should be considered a porch area" in which he and Bond had an expectation of privacy, brief for appellant at 16, and we see no reason not to accept his invitation to treat it as such for purposes of argument.

"The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 1415, 185 L. Ed. 2d 495 (2013), quoting *Oliver v. United States*, 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). Although a front porch is therefore a constitutionally protected area, a police officer does not engage in an "unlicensed physical intrusion" by entering that area to knock on the front door. *Jardines*, 133 S. Ct. at 1415. See, also, *Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011) (law enforcement officers not armed with warrant may knock on door, because they do no more than any private citizen might do). This is because a visitor, including a police officer, has an implicit license to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 133 S. Ct. at 1415.

It is only when an officer exceeds the scope of that license, such as by using a trained police dog to search the front porch for incriminating evidence, that a Fourth Amendment violation occurs. See *Jardines, supra*.

When the investigators and Willden ascended the stairs and knocked on the apartment door with the hopes of speaking to Turner and Bond about the hotline report, they did nothing to exceed the scope of their implicit license to approach the door and knock. Any doubt about this conclusion is resolved when one considers that Turner's reaction to the knocking was to say, "Come in," which suggests Turner was not alarmed to have visitors knocking on the upstairs door. Thus, even assuming arguendo the enclosed stairway was the equivalent of a porch area, as Turner suggests, no constitutional violation occurred. See *State v. Breuer*, 577 N.W.2d 41 (Iowa 1998) (holding that law enforcement officer without warrant did not unreasonably invade suspect's legitimate expectation of privacy by opening unlocked outer door of apartment building and proceeding up stairway to apartment door). Although Turner argues law enforcement did not have probable cause to investigate him and Bond after an interview of Turner's sons did not substantiate the hotline report, no probable cause is required for a "knock and talk" like the one that occurred here. See *King, supra* (when law enforcement officers not armed with warrant knock on door, they do no more than any private citizen might do; no Fourth Amendment violation occurs).

We next address the entry into the apartment itself. Generally, absent exigent circumstances, a law enforcement officer must have a warrant or consent to enter a person's home. *State v. Resler*, 209 Neb. 249, 306 N.W.2d 918 (1981). As stated, consent must be a free and unconstrained choice, not the result of a will overborne. See *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001). Investigator Mann testified that after she knocked on the upstairs door and Turner opened it, she identified herself and Willden, explained they had received a complaint, and asked if they could "come in and chat with him

about it." Turner said yes and invited them inside. Investigator Kottwitz' testimony was consistent; however, Willden testified it was Bond who invited them inside. Regardless of who extended the invitation, there was no evidence that the entry into the apartment was anything but consensual; therefore, the entry into the apartment was lawful.

We have concluded that the investigators' entries into the stairway and apartment were lawful; however, before we can turn to the voluntariness of the consents to search, we must address the legality of law enforcement's presence in the apartment for approximately 3 hours prior to obtaining the consents to search. If law enforcement's presence in the apartment for this period constituted an unreasonable and "excessively long seizure and detention," as Turner contends, brief for appellant at 16, we will be required to determine whether there was a sufficient attenuation between the illegal seizure and the consents to search. See *State v. Gorup*, 279 Neb. 841, 782 N.W.2d 16 (2010) (where consensual search follows illegal police conduct, court must determine whether consent was exploitation of prior illegality).

[3,4] Generally, a seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *State v. Hedgcock*, 277 Neb. 805, 765 N.W.2d 469 (2009). A seizure may occur where an officer directly tells a suspect that he or she is not free to go; in addition, "circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*. at 815, 765 N.W.2d at 479.

At a minimum, no Fourth Amendment seizure occurred during Turner and Bond's initial interaction with the investigators and Willden. The interaction consisted of a lawful entry into the apartment, noncoercive questioning regarding the hotline

report, and observation of the children's sleeping area and Turner and Bond's food supply. No reasonable person would have believed he or she was not free to leave during this consensual encounter.

Likewise, no Fourth Amendment seizure of Turner and Bond occurred when Investigator Mann learned Castro had a warrant for his arrest and requested a patrol unit to transport Castro to jail. According to Investigator Mann, this process "took up some time"; however, Turner and Bond had no reason to believe they were not free to leave merely because Castro was being arrested on a warrant unrelated to the hotline report investigation.

It was only after Castro was removed from the apartment that the tenor of Turner and Bond's interaction with the investigators changed. After Castro was removed, Investigator Kottwitz observed a backpack, of which neither Turner nor Bond claimed ownership; inside the backpack, which Turner and Bond agreed could be searched, Investigator Mann found drug paraphernalia and suspected methamphetamine. There was then a discussion about consent to search the apartment and a discussion "amongst officers" about whether to seek a search warrant. Bond, who unlike Turner wanted to consent to a search of the apartment, requested that Investigator Mann accompany her to the bathroom. In the bathroom, Bond told Investigator Mann she would give up "everything" and "wanted to know if that would kind of make all this go away." After Investigator Mann told Bond she could not answer because she did not know what Bond had, Bond led her to the bedroom, where she handed the investigator a marijuana pipe, a methamphetamine pipe, and a baggie with suspected methamphetamine. Investigator Mann told Bond she still wanted to search the apartment, and the two returned to the living room, where Bond discussed with Turner whether to give consent. Turner and Bond could not agree, and Investigator Mann interrupted three or four times to tell them "time's ticking" and asked for a decision. Eventually, Investigator Mann said

"time's up" and left to seek a search warrant while Officer Tjaden stood by in the apartment "to make sure no evidence was destroyed."

Even assuming a seizure occurred during the prolonged interaction that culminated with Officer Tjaden standing by while Investigator Mann left to seek a search warrant, no Fourth Amendment violation occurred. In *Illinois v. McArthur*, 531 U.S. 326, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001), the U.S. Supreme Court held that police officers did not violate the Fourth Amendment when they detained a man outside his trailer home for approximately 2 hours while other officers obtained a search warrant. In that case, police had probable cause to believe the man's home contained drugs; they had good reason to fear that, unless restrained, the man would destroy the drugs before they returned with a warrant; they neither searched the trailer home nor arrested the man before obtaining a warrant; and they restrained the man for a "limited period of time" of 2 hours. *Id.*, 531 U.S. at 332. The Court explained that it had "upheld temporary restraints where needed to preserve evidence until police could obtain a warrant," *id.*, 531 U.S. at 334, and noted it had found no case in which it had "held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time," *id.*

In the present case, unlike in *McArthur, supra*, police did not restrain Turner and Bond outside of their apartment while another officer obtained a warrant; instead, after the investigators lawfully entered the apartment with the consent of Turner and/or Bond, Officer Tjaden stood inside the residence observing Turner and Bond while Investigator Mann left to obtain a warrant. However, we see no reason to treat the alleged seizure of Turner and Bond inside their apartment differently than the seizure that occurred outside the trailer home in *McArthur*. As in *McArthur*, when Investigator Mann left to obtain a search warrant, the investigators had probable

cause to believe the apartment contained drugs. Further, it was reasonable for Investigator Mann to believe that if she left Turner and Bond unsupervised in the apartment while she obtained a warrant, the two would destroy any remaining evidence of drugs. Additionally, although Turner characterizes the alleged detention as "excessively long," brief for appellant at 16, it was approximately the same length as, if not shorter than, the detention in *McArthur*. Considering the totality of the circumstances, we conclude the investigators' conduct, assuming it constituted a Fourth Amendment seizure, was reasonable.

Because we have concluded the investigators' conduct prior to obtaining consents to search was not illegal, we need not address the issue of attenuation. Accordingly, we turn to the issue of the voluntariness of the consents to search.

[5-7] Consent to search must be voluntarily given and not the result of duress or coercion, whether express, implied, physical, or psychological. See *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001). In examining all the surrounding circumstances to determine if in fact a consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. *State v. Prahin*, 235 Neb. 409, 455 N.W.2d 554 (1990). Mere submission to authority is insufficient. *Tucker, supra*. Where, as here, both occupants of a jointly occupied premises are physically present, the consent of one occupant to a search is insufficient when the other occupant objects to the search. *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006). See, also, *Fernandez v. California*, ___ U.S. ___, 134 S. Ct. 1126, 188 L. Ed. 2d 25 (2014) (declining to extend *Randolph, supra*, to situation where objecting occupant is absent when another occupant consents).

[8,9] The determination of whether consent to search is voluntarily given is a question of fact to be determined from the totality of the circumstances. *State v. Ready*, 252 Neb.

816, 565 N.W.2d 728 (1997). The burden is upon the government to prove that a consent to search was voluntarily given. *Prahin, supra*.

The district court's finding that Bond voluntarily consented to the search of the apartment was not clearly erroneous. From the moment the issue of consent to search the apartment arose, Bond wanted to consent to the search; it was only Turner who was reluctant. There is no evidence that police pressured or coerced Bond to consent to a search. Rather, the evidence clearly established that Bond was eager to cooperate with the investigators and even voluntarily handed Investigator Mann her marijuana pipe, her methamphetamine pipe, and a baggie with suspected methamphetamine. Bond's consent to the search was voluntary.

Regarding Turner's consent to the search, the district court found that "[i]f anyone overbore Turner's will, it was Bond, not the officers in question"; this finding was not clearly erroneous. There was little to no evidence that the investigators or Officer Tjaden pressured Turner into consenting to a search of the apartment. At most, the investigators discussed the issue of consent to search with Turner and Bond and told them they were leaving to obtain a search warrant after the two could not agree on whether to consent. In *Tucker, supra*, the Nebraska Supreme Court held that consent was not coerced where officers repeatedly asked a suspect for permission to enter his apartment to look for illegal items and threatened to get a search warrant, eventually leading the suspect to step back from the door with his arms raised and his hands upward and outward. Here, there was much less evidence of police pressure; in fact, when Turner ultimately agreed to consent to a search, the only law enforcement officer present in the apartment was Officer Tjaden, who was standing by and never discussed the issue of consents to search with the two suspects. Turner consented after Bond begged and pleaded with him, not upon the prompting of any police officer. The district court properly upheld the consensual search of the apartment.

Turner also raises some miscellaneous issues we must address. He contends that Investigator Mann searched his person on two occasions—once by patting him down for weapons prior to leaving to obtain a search warrant and once after she returned to the apartment. He contends "[t]hese searches are the fruits of the illegal entry and anything resulting from those searches is inadmissible." Brief for appellant at 24. However, the evidence at the suppression hearing was that Investigator Mann's first pat down of Turner revealed nothing. Investigator Mann further testified that after she returned to the apartment, Turner "stuck his hands in his pocket real quick," and the investigators asked him to remove his hands. At that point, Turner said he was going to empty his pockets, which he did, revealing suspected drugs and drug paraphernalia. As the district court determined, Turner's voluntary emptying of his pockets was not a Fourth Amendment search.

Turner also asserts that all statements he made prior to receiving warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), resulted from custodial interrogation and should be suppressed (he does not identify any specific statements). Having reviewed the record, we conclude the district court properly determined that Turner did not make any statements resulting from custodial interrogation prior to the time he received warnings pursuant to *Miranda, supra*.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court for Hall County.

AFFIRMED.